**UNITED STATES of America, Appellee,**

v.

**Peter RIVERA, Jr., a/k/a "Little Pete", Pedro Rivera, Sr., Sonia Rivera, August Laguer, Defendants.**

**Appeal of Pedro RIVERA, Sr., Sonia Rivera, August Laguer, Defendants–Appellants.**

**Nos. 217, 17 and 18, Dockets 87–1053, 87–1054 and 87–1131.**

United States Court of Appeals, Second Circuit.

Argued Sept. 10, 1987.

Decided Feb. 18, 1988.

Arthur Mercado, Asst. U.S. Atty., S.D. N.Y. (Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., Kerri L. Martin, Asst. U.S. Atty., of counsel), for appellee.

Baden Kramer Huffman & Brodsky, New York City (Richard L. Huffman, New York City, for defendant-appellant Sonia Rivera.

Dwight L. Greene, Hofstra Law School, Hempstead, N.Y., for defendant-appellant Laguer.

Frederick H. Block, New York City, for defendant-appellant Pedro Rivera.

Before PRATT, MAHONEY, Circuit Judges, and BRIGHT, Senior Circuit Judge, for the Eighth Circuit (sitting by designation).

GEORGE C. PRATT, Circuit Judge:

After a mistrial, we affirmed Judge Walker's denial of defendants' motions for double jeopardy dismissals of the indictment. *United States v. Rivera*, 802 F.2d 593 (2d Cir.1986). On the second trial Sonia Rivera, Pedro Rivera, and August Laguer were convicted of conspiracy to possess and distribute heroin. In addition, the Riveras were both convicted of two substantive counts of heroin distribution, and Pedro Rivera was convicted of possession of a weapon by a felon.

Defendants raise a number of issues on this appeal, none of which warrants reversal, but three of which require fairly extended discussion: (1) When does an action occasioning a retrial become final for Speedy Trial Act purposes? (2) Was Laguer's prosecution on the conspiracy charge barred by his prior plea agreement with the government? (3) Was the government's proof of constructive possession of a weapon by Pedro Rivera sufficient? Resolving all issues against the defendants, we affirm.

## BACKGROUND

At the trial on the charges in the 14 count indictment that led to the convictions now appealed from ("1985 indictment"), the evidence established that the Riveras and Laguer were high-level members of an operation that sold "White Horse" brand heroin on the lower east side of Manhattan during 1983. The government's evidence included the testimony of George Lopez and Warren Toney, who were also members of the "White Horse" organization, the testimony of Drug Enforcement Special Agent Camille Colon, 596 glassine envelopes filled with heroin and stamped with the "White Horse" logo (the picture of a horse), as well as other physical evidence seized during judicially authorized searches of the Rivera apartment in Manhattan and the Queens apartment of co-conspirator Peter Rivera, Jr., who was tried separately.

When Lopez became a street manager for the organization in March 1983, he received his daily supply of drugs from Laguer and sold them on Ludlow Street. Later, the location was permanently changed to Second Street and Avenue B. Although, during this period, Laguer usually dropped off the heroin and picked up the day's receipts from Lopez, on two occasions Lopez picked up heroin from the Rivera apartment in Manhattan.

After Lopez was arrested in possession of "White Horse" heroin in June 1983, Toney replaced him as manager of the Second Street and Avenue B spot. Laguer continued to drop off the heroin and pick up the proceeds for approximately six weeks after Toney took over the spot. After that, Toney picked up the heroin from Sonia Rivera, Peter Rivera, Jr., or Pedro Rivera at the Riveras' Manhattan apartment or on Ludlow Street from Pedro Rivera.

Acting in an undercover capacity, special agent Colon purchased "White Horse" heroin from Toney and Lopez on two occasions in August and September 1983. As a result, Toney was arrested in October 1983 possessing 20 bundles (200 glassines) of "White Horse" heroin, and a search of his apartment led to the recovery of his beeper, two guns, and address books with Laguer's and the Riveras' Manhattan telephone numbers in them.

A subsequent search of Peter Rivera, Jr.'s apartment uncovered two guns, am-

munition, a porcelain white horse, a photo of Laguer and a large quantity of jewelry. In the Riveras' Manhattan apartment agents recovered four guns, ammunition, a small amount of heroin and heroin traces, a court paper signed by Laguer, a box of glassine envelopes, cash, jewelry, a telephone book with Laguer's and Toney's names and beeper numbers in it, a manual for a scale used to weigh drugs, a bulletproof vest, and three glass-framed drawings of white horses, two of which were labeled "White Horse".

The weapons included a pen gun found in Pedro Rivera's dresser, a rifle recovered from the closet of the children's room, a loaded .380 calibre semi-automatic hand gun recovered from behind a false panel in the linen closet, and a gun discovered on top of a wall unit in the living room. The heroin was found in a man's jacket in Pedro Rivera's bedroom.

## DISCUSSION

### I. *Speedy Trial Act.*

 Defendants claim that the indictments underlying their convictions should be dismissed with prejudice because their retrial did not begin within the 70 days specified in the Speedy Trial Act, which provides:

If the defendant is to be tried again following a declaration by the trial judge of a mistrial or following an order of such judge for a new trial, the trial shall commence within seventy days from the date the action occasioning the retrial becomes final. If the defendant is to be tried again following an appeal or a collateral attack, the trial shall commence within seventy days from the date the action occasioning the retrial becomes final * * *. The periods of delay enumerated in section 3161(h) are excluded in computing the time limitations specified in this section. The sanctions of section 3162 apply to this subsection.

18 U.S.C. § 3161(e) (1982). In this case defendants' concession that the "action occasioning the retrial" was this court's affirmance of the district court's denial of their double jeopardy motions is not accurate, because the "action occasioning the retrial" was the district court's grant of the mistrial motion on March 26, 1986. Seven speedy trial days ran between that date and April 2, 1986, when the appellants filed their double jeopardy motions. On April 22, 1986, when Judge Walker denied their motions, the appellants filed a notice of appeal. Thus, beginning on April 2, 1986, the time was excludable under § 3161(h)(1)(F) (delay resulting from any pretrial motion) and § 3161(h)(1)(E) (delay resulting from any interlocutory appeal).

Because seven speedy trial days had already run prior to the appeal, the Speedy Trial Act would have been violated if there were more than 63 nonexcludable days between the date the clock resumed and the beginning of the trial on December 1, 1986. Thus, the critical issue for us is when the speedy trial clock resumed following the interlocutory appeal, and in order to determine this issue we must decide when the interlocutory appeal became final.

 In a case where the appellate court orders a new trial after conviction, it is the appeal that constitutes "the action occassioning the retrial", and the 70–day period begins to run, according to § 3161(e), on the date the appeal becomes final. In the situation at hand, however, an interlocutory appeal after the district court had declared a mistrial, the 70–day period had already started to run anew when the mistrial was declared, and the speedy trial clock resumed on the date the exclusion allowed for an interlocutory appeal, § 3161(h)(1)(E), ended, *i.e.*, when the appeal became final.

Defendants argue that the appeal became final on August 28, 1986, the date we issued our summary order affirming Judge Walker's denial of their motions to dismiss. Alternatively, they argue that the appeal became final on September 19, 1986, because Fed.R.App.P. 41 provides that the mandate of the appellate court "shall issue 21 days after entry of judgment." If either date marked the end of the interlocutory appeal, defendants argue, more than 70 days would have elapsed before the trial

began, causing a Speedy Trial Act violation. The government argues that the clock resumed on the date the mandate actually issued, September 26, 1986, leaving five days still available when the trial actually began.

■ Six circuits have addressed the issue and have adopted the rule that for the purpose of § 3161(e) an appeal becomes final on the date the mandate is issued. *See, e.g., United States v. Robertson,* 810 F.2d 254, 259 n. 6 (D.C.Cir.1987); *United States v. Scalf,* 760 F.2d 1057, 1059 (10th Cir.1985); *United States v. Rush,* 738 F.2d 497, 509 (1st Cir.1984), *cert. denied,* 471 U.S. 1120, 105 S.Ct. 2370, 86 L.Ed.2d 269 (1985); *United States v. Ross,* 654 F.2d 612, 616 (9th Cir.1981), *cert. denied,* 455 U.S. 926, 102 S.Ct. 1290, 71 L.Ed.2d 470 (1982); *United States v. Cook,* 592 F.2d 877, 880 (5th Cir.), *cert. denied,* 442 U.S. 921, 99 S.Ct. 2847, 61 L.Ed.2d 289 (1979); *United States v. Russo,* 550 F.Supp. 1315, 1319 (D.N.J.1982), *aff'd,* 722 F.2d 736 (3rd Cir.1983), *cert. denied,* 464 U.S. 1045, 104 S.Ct. 716, 79 L.Ed.2d 179 (1984). *But see United States v. Lasteed,* 832 F.2d 1240, 1243 (11th Cir.1987). For the following reasons we reject the defendants' arguments and adopt the rule followed by these circuits.

■ A general explanation of what a "mandate" is and how it issues in this circuit is a necessary starting point. To begin, we decide cases either by opinion or by summary order. On the 21st day from the date on which an opinion issues, the clerk of the appellate court files the mandate, which consists of a copy of the opinion, a judgment that has been drafted and signed by a clerk of the court, and any direction as to costs. *See* Fed.R.App.P. 41; *Ostrer v. United States,* 584 F.2d 594, 598 (2d Cir.1978). In the case of a summary order, a separate written judgment is not included in the mandate. In either case the clerk of the court signs her name on a copy of the judgment or order that is stamped "MANDATE" at the top of the first page and "true copy" at the bottom of the last page. The original copies of the judgment or order and the opinion are retained by the

clerk's office, and the "true copy", along with a second copy of the first page of the judgment, or order, plus a copy of any opinion, is sent to the district court from which the appeal was taken. The clerk records this event, which *is* the issuance of the mandate, by signing her name and the date on a docket card next to a notation indicating that the mandate has issued.

After receiving the mandate, the district clerk signs the second copy and returns it to the circuit court clerk's office, where it is filed. Once a month, the clerk's office sends to the clerk of each district court a list of all the mandates issued to that court during the month so that the district clerk can verify receipt of all the mandates that were sent.

■ Although, prior to December 20, 1987, parties were not notified when a mandate issued, they could, and often did, call either our clerk's office to ascertain whether the mandate had been issued or the district clerk to determine whether it had been received. In addition to ascertaining when the mandate issues, a diligent appellate attorney should check the language of the judgment itself to insure that it conforms to the order or opinion of the appellate court. *See* R. Martineau, *Modern Appellate Practice,* § 17.1 (1983).

We are advised by the circuit clerk's office that the mandate procedure has undergone re-examination in recent months. As a result, the clerk's office has added the following to its procedures for issuance of the mandate. First, the copy of the judgment or summary order that is sent to the district court, in addition to being stamped "MANDATE" and "true copy", will bear a sticker saying "mandate issued" and indicating the date of issuance. Second, the attorneys for the parties will be sent a copy of the mandate that bears this sticker. We trust that these additional procedures will help to eliminate any future confusion about when a mandate issues.

■ As our review of these procedures makes clear, the subjective intent of the panel deciding a particular case is irrelevant to the fact of whether or not the

mandate actually issued. Nor is the mandate deemed issued merely upon the filing of an opinion or summary order. For the mandate to issue there must be "[a] certified copy of the judgment and a copy of the opinion, if any, and any direction as to costs * * * unless the court directs that a formal mandate issue." *See* Fed.R.App.P. 41. Since the clerk has responsibilities for entering a judgment, Fed.R.App.P. 36, and for taxation of costs, Fed.R.App.P. 39(d), it may fairly be inferred that the duty to issue the mandate contemplated by Rule 41 is also a responsibility of the clerk.

■ While a panel or a judge may give directions affecting the mandate, it is the clerk, not the judges, who "issues" it. There is no rule or formal authorization in this circuit, or in any other circuit that we are aware of, that provides for issuance of the mandate by court order rather than by action of the clerk. Nevertheless, appellants argue that because we expressed, in our summary order of August 28, 1986, what all parties and this court concede was most likely an erroneous belief that retrial was scheduled for September 8, 1986, we must have intended to revest jurisdiction in the district court immediately when the order issued. Appellants rest this argument in part on § 41 of the Second Circuit's Rules Supplementing the Federal Rules of Appellate Procedure. That section provides:

> In all cases in which an appeal from an order or judgment of the district court or a petition to review or enforce an order of an agency is decided in open court, the mandate shall issue forthwith unless the court otherwise directs. The mandate shall also issue forthwith in any case wherein the clerk enters an order dismissing an appeal or a petition to review or enforce an order of an agency for default in filings, as directed by an order of the court or a judge.

This supplementary rule does not, however, circumvent or make unnecessary the formal requirement that the clerk's office must execute certain concrete procedures which themselves constitute issuance of the mandate.

■ Simply put, jurisdiction follows the mandate. *See Ostrer*, 584 F.2d at 598 ("The effect of the mandate is to bring the proceedings in a case on appeal in our Court to a close and to remove it from the jurisdiction of this Court, returning it to the forum whence it came."); *accord Rush*, 738 F.2d at 509; *Ross*, 654 F.2d at 616; *Cook*, 592 F.2d at 880; *Russo*, 550 F.Supp. at 1318. For Speedy Trial Act purposes the same rule applies whether the case involves retrial following appeal or a pretrial interlocutory appeal. *See Rush*, 738 F.2d at 509 ("In both situations it is the date on which the mandate is issued which determines when the district court reacquires jurisdiction for further proceedings.") (citation omitted).

■ Because issuance of the mandate is an event of considerable institutional significance, particularly since enactment of the Speedy Trial Act, we are unable to say, as defendants would have us say, that the mandate "issued" simply because it should have been issued, or because the panel may have intended it to issue, or because the statute commands it to issue. We note that neither the Riveras nor Laguer called the court's attention to the fact that the mandate was not issued on the 21st day, nor did any party move for issuance of the mandate pursuant to Fed.R.App.P. 27, 41. Had they timely done so, the problem in this case might have been avoided.

Finally, defendants urge reversal for another reason. In another case, *United States v. Langella*, 804 F.2d 185 (2d Cir. 1986), the interlocutory appeal was argued the same day as the first appeal in this case and there, as here, in order to allow the trial to go forward, we entered a summary order on August 28, 1986, with a direction that a formal opinion would follow. Before the formal opinion and mandate in that case issued, however, the trial actually commenced. From this fact defendants argue that to hold that their interlocutory appeal, and with it the appellate court's jurisdiction, did not end until the mandate actually issued, would mean that the district court lacked jurisdiction to try the *Langella* case, which was a particular-

ly long and complicated prosecution. This argument for reversal is unpersuasive. First, even if correct, the contention is irrelevant. Second, the issue was not raised in *Langella*, which has already been decided by another panel of this court. *See United States v. Persico*, 832 F.2d 705 (2d Cir.1987) (affirming convictions of six defendants, including Langella, for various offenses arising from Columbo family racketeering enterprise but reversing substantive RICO convictions of two other defendants).

We conclude, as have our six sister circuits, that after the interlocutory appeal, the speedy trial clock resumed when our clerk issued the mandate on September 26, 1986. It continued to run until November 25, 1986, when the defendants filed their motions to dismiss on speedy trial grounds, thus triggering another exclusion under § 3161(h)(1)(F). Those motions were denied orally and the trial began on December 1, 1986. The seven nonexcludable days that had passed prior to the interlocutory appeal plus the 58 nonexcludable days that passed from the time the mandate issued until the date the trial began, total 65 days, or five less than the 70 permitted by the statute. Consequently, defendants were subjected to no speedy trial violation.

## II. *1984 Plea Agreement.*

In the first appeal of this case, we rejected double jeopardy claims brought under *Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982). *See* 802 F.2d 593 (2d Cir.1986). We also rejected Laguer's claim, which was fully briefed and argued, that his prosecution for conspiracy would violate a 1984 plea agreement. Pursuant to that agreement, Laguer had pled guilty to a substantive drug distribution count and, in exchange, the United States Attorney's office dismissed a conspiracy count. In the indictment that led to the plea agreement ("1984 indictment") Laguer and his co-defendants Edwin Rivera and Michael Mauleon were charged with conspiring to distribute heroin in the vicinity of Manhattan's Henry and Clinton Streets in the Southern District of New York and with selling, on or about April 3, 1984,

heroin packaged in ten plain glassine envelopes to an undercover police office.

Although in our published opinion we focused on the double jeopardy claim under *Oregon v. Kennedy*, we did address Laguer's plea agreement claim briefly in our summary order of August 28, 1986. On this appeal, Laguer raises the same claim, based on the same arguments, and urges us to reconsider and clarify our previous decision; he does not claim any change in circumstances arising out of the retrial itself. The government has responded to Laguer's renewal of his previously litigated claim by stating merely that Laguer has offered no reason why we should reconsider our earlier decision.

Although we agree that neither Laguer's briefs nor our examination of the record reveals any new information—such as a variance between what the government had represented they would prove at trial and what the evidence at trial actually proved— we nevertheless address the issue again in order to make clear the basis for our earlier order.

Laguer concedes that his claim is based on a breach of his 1984 plea agreement with the government. He has argued his claim, however, as if it were a double jeopardy claim, citing *United States v. Alessi*, 536 F.2d 978, 980 (2d Cir.1976), for the proposition that similar interests are at stake when the government allegedly violates due process by failing to fulfill an earlier promise not to prosecute, and when a claim is raised under the double jeopardy clause of the fifth amendment. We have no quarrel with this general proposition, but we do question whether the double jeopardy cases relied upon by Laguer, *see, e.g., United States v. Abbamonte*, 759 F.2d 1065 (2d Cir.1985); *United States v. Papa*, 533 F.2d 815 (2d Cir.1976); *United States v. Mallah*, 503 F.2d 971 (2d Cir.1974), *cert. denied*, 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975), are controlling in a case that arises from an alleged breach of a plea agreement. We need not reach that question, however, because under either analysis the result in

this case would be the same: Laguer's prosecution for the "White Horse" conspiracy was not barred by the 1984 plea agreement.

▆▆▆ In our summary order of August 28, 1986, we stated:

Laguer's claim that the conspiracy count of the pending indictment violates a plea agreement he entered with the Southern District United States Attorney's office in 1984 is * * * without merit. There, Laguer pled guilty to a substantive narcotics offense in exchange for the government's agreement to dismiss the related conspiracy charge. Thus, prosecution of the conspiracy charged in the pending indictment is barred only if that conspiracy is the same offense as the one dismissed in 1984. *See United States v. Annabi*, 771 F.2d 670, 672 (2d Cir.1985). The government correctly argues that the conspiracies are distinct.

The 1984 indictment alleged a one-day conspiracy in which Laguer sold ten glassine bags of heroin to an undercover officer on the street. The present indictment alleges Laguer's involvement in a large-scale heroin operation that lasted over three years and involved large distributions to other co-conspirators. Laguer is the only overlapping participant and there are no shared overt acts between the two conspiracies. The main similarity urged by Laguer is that both conspiracies allegedly existed in the same section of New York City. With no other indication that the conspiracies are interdependent, we affirm the district court's determination that Laguer is not being tried in violation of his prior plea agreement.

We now incorporate that portion of our summary order into this opinion and expand upon it as follows.

In *Annabi*, like this case, the defendants appealed from the denial of a motion to dismiss criminal charges that was based on the claim that the prosecution was barred by a prior plea agreement. 771 F.2d at 661 (per curiam). In that case, however, the plea agreement involved charges that had been brought in the Eastern District of New York while the charges on appeal were pending in the Southern District of New York. We held that "unless it affirmatively appears that the agreement contemplates a broader restriction", a plea agreement is binding only on the office of the United States Attorney for the district in which it is entered. *Id.* at 672. We concluded further that because the Annabis were never in jeopardy on the charges that had been dismissed pursuant to the earlier plea agreement, they were seeking greater protection than that afforded by the double jeopardy clause. *Id.* Finally, we rejected the claims to the extent that they relied on the double jeopardy clause, because the pending charges involved conduct extending more than two years beyond the period of time covered by the dismissed charges and were, therefore, not identical to the dismissed charges. *Id.*

*Annabi* controls the disposition of this case. Laguer concedes that his 1984 plea agreement rested on a government promise not to prosecute the conspiracy charge described in the 1984 indictment.

For a number of reasons, including the time frame differential that was crucial in *Annabi*, the current charges as set forth in the 1985 indictment were sufficiently distinct from the 1984 indictment to defeat Laguer's claim. *See id.*

Underlying the 1984 indictment was a single street-level sale of a known quantity of unmarked heroin that took place on April 3, 1984. The 1985 indictment, however, charges Laguer with conspiring with the Riveras to distribute unknown quantities of heroin from February, 1981, through the date of the indictment in December 1985. The only co-conspirator common to the two conspiracies was Laguer, and although both conspiracies operated on the lower east side, the proof at trial indicated that Laguer's activities on behalf of the "White Horse" organization took place at a regular, designated spot that was different from the location of the 1984 street sale.

On the first appeal the government represented that the proof at the anticipated

trial, like the proof at the aborted trial, would show that Laguer held a high-level position in the "White Horse" organization until some time in the summer of 1983. The transcript of the retrial is consistent with this representation.

Laguer's claim thus fails for the following reasons: (1) there is a temporal disparity between the 1984 and 1985 indictments; (2) there is no identity of personnel, other than Laguer, in the two conspiracies; (3) the specific locations of the sales were different; (4) Laguer performed a vastly different role in the "White Horse" organization than he did during the April 3, 1984, sale; and (5) there is no evidence that the unmarked heroin Laguer sold in 1984 was marketed by the same organization that sold the "White Horse" heroin that was the subject of the 1985 indictment.

Laguer would have us hold that his prosecution for managerial level participation in a four year conspiracy is barred by his plea agreement as to an apparently unrelated conspiracy merely because the one-day conspiracy of the 1984 indictment falls within the four-year period of the 1985 indictment. Such an expansive application of the 1984 plea agreement would reflect neither the intent of the parties when it was made, nor a fair reading of the substance of the agreement.

Laguer relies on *Abbamonte,* 759 F.2d 1065, 1069; *Papa,* 533 F.2d 815, 821; and *Mallah,* 503 F.2d 971, 986, in arguing that when a defendant introduces sufficient evidence of one conspiracy, the burden shifts to the government to rebut that showing. As we noted above, however, these cases involved "pure" double jeopardy claims raised by defendants who had been previously prosecuted for the allegedly identical conspiracy and who had made an affirmative showing of overlap between two conspiracy indictments. We need not decide what that showing must entail in order to shift the burden to the government, because, even if *Abbamonte, Papa* and *Mallah* might be applicable here, Laguer has made no showing at all that would require further information from the government.

Laguer also argues that the overlap between the 1984 and 1985 conspiracies was not essentially geographical, that "No Name" heroin and "White Horse" heroin were sold by the same organization headed by Carlos Gallatti, and that Laguer sold both of these brands during the 1981–84 period encompassed by the 1985 indictment. These contentions, which Laguer supports by reference to government charts introduced at the aborted trial, are insubstantial.

First, Laguer has never offered any proof that the unmarked heroin he sold in 1984 was in fact the "No Name" brand of heroin marketed by Gallatti and not just unmarked heroin. The only evidence on this point indicates that the corner on which Laguer sold in 1984 was not the corner where "No Name" was sold.

In addition, the government chart that Laguer seeks to rely on actually supports the government's position. That chart bears the heading "No Name/Blackmark/Flying Tiger/White Horse/M–16" and diagrams the hierarchy of individuals who sold these brands of heroin. At the top of the chart, listed as owners are Pedro Rivera and Carlos Gallatti; Laguer appears at the next highest level, as an underboss working under Rivera. At this level, the two networks diverge, with one group of underbosses, street managers, and couriers working under Rivera, and a different group working under Gallatti. In addition to illustrating Laguer's high-level position in the Rivera-headed heroin conspiracy, the chart suggests that Rivera and Gallatti were co-equals in parallel hierarchies and, therefore, that Gallatti was not the unifying link between the 1984 and 1985 conspiracies. Furthermore, the fact that the Rivera organization may have marketed both "No Name" and "White Horse" brands of heroin does not mean that separate conspiracies related to the sales of the different brands could not be charged against the same parties.

In *United States v. Korfant,* 771 F.2d 660, 662 (2d Cir.1985), we identified a number of factors "relevant to the task of individuating conspiracies in determining

the merits of double jeopardy claims". These factors included:

> (1) The criminal offenses charged in successive indictments; (2) the overlap of participants; (3) the overlap of time; (4) similarity of operation; (5) the existence of common overt acts; (6) the geographic scope of the alleged conspiracies or location where overt acts occurred; (7) common objectives; and (8) the degree of interdependence between alleged distinct conspiracies.

*Id.* at 662 (citations omitted). We also stated that "by resort to an array of indicia, a court may address the merits of a double jeopardy claim in light of the totality of the circumstances presented by a particular conspiracy charge." *Id.* Thus, even if the broader protections and, logically, more rigorous standards applicable to a double jeopardy claim were to be applied here, our analysis of the totality of the circumstances of this case would lead us to reject Laguer's claim.

### III. *Constructive Possession.*

Pedro Rivera challenges the sufficiency of the evidence supporting his conviction for possession of a weapon by a convicted felon, 18 U.S.C. § 922(h)(1) (1982). The weapon in question was the hand gun that was found behind a panel in a hall closet in Rivera's Manhattan apartment. 18 U.S.C. § 922(h)(1) provides:

> (h) It shall be unlawful for any person—
> (1) who is under indictment for, or has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year * * * * to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

Rivera claims that although there was proof by stipulation that he was a convicted felon and that the weapon had travelled in interstate commerce, the government failed to prove that he received or possessed the weapon in question. Rivera's claim falls short of the demanding standard a defendant must meet in order to secure reversal of a jury verdict based on insufficient evidence. *See, e.g., Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.

2d 560 (1979) (if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt", conviction must be upheld) (emphasis in original); *United States v. Buck,* 804 F.2d 239, 242 (2d Cir.1986) ("one who challenges on appeal the sufficiency of the evidence * * * bears 'a very heavy burden' ") (citations omitted); *United States v. Badalamenti,* 794 F.2d 821, 828 (2d Cir.1986) ("in evaluating [a sufficiency of the evidence] claim, we must view the evidence in the light most favorable to the government and construe all possible inferences in its favor") (citation omitted).

■ Proof of constructive possession of a weapon satisfies the receipt element of § 922. *See United States v. Beverly,* 750 F.2d 34, 36 (6th Cir.1984); *United States v. Craven,* 478 F.2d 1329, 1336 (6th Cir.), *cert. denied,* 414 U.S. 866, 94 S.Ct. 54, 38 L.Ed. 2d 85 (1973). In *United States v. Tribunella,* 749 F.2d 104 (2d Cir.1984), we explained that:

> Constructive possession exists when a person * * * knowingly has the power and the intention at a given time to exercise dominion and control over an object, * * * and [it] may be proved by direct or circumstantial evidence. It is not necessary that such evidence remove every reasonable hypothesis except that of guilt.

*Id.* at 111–12 (quoting *United States v. Craven,* 478 F.2d 1329, 1333). In *Tribunella,* we concluded that "the evidence showed far more than * * * mere proximity", *id.* at 112, to the weapon and was therefore sufficient to support a jury finding of constructive possession where (a) the gun was found above the ceiling of the defendant's bedroom, (b) other members of the family testified that they knew nothing about guns, (c) the evidence indicated that the defendant owned guns, and (d) ammunition and a magazine about guns were found in his room. *Id.* In a conclusory fashion, Rivera suggests that *Tribunella* is inapplicable here. We disagree.

■ The evidence in this case shows more than Rivera's mere proximity to the

weapon in question. In addition to that gun, three other weapons were found in the apartment, which was the center of a large scale heroin operation. Since weapons are the "tools of the [narcotics] trade", *United States v. Weiner,* 534 F.2d 15, 18 (2d Cir.), *cert. denied,* 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976), Rivera had a motive to exercise dominion and control over the gun. *See United States v. Foster,* 783 F.2d 1087, 1089 (D.C.Cir.1986) (" '[p]roximity, presence or association is sufficient when accompanied * * * [by] testimony connecting the defendant with * * * incriminating surrounding circumstances' ") (citations omitted); *United States v. Hernandez,* 780 F.2d 113, 116–17 (D.C.Cir.1986) (evidence of motive or purpose in using the item, such as narcotics dealing, can be probative of constructive possession).

Rivera contends that the gun could have belonged to one of the other occupants of the apartment (his wife and their two daughters) or to Peter Rivera, Jr. Nevertheless, it was in Pedro Rivera's dresser that another gun was found, and there was no evidence that any of the women were personally familiar with weapons. In addition, there was no evidence that Peter Rivera, Jr. had visited the Manhattan apartment after 1983, and, even if he did, it is unlikely that he would have hidden a loaded gun there without Pedro Rivera exercising dominion and control over the gun as well. It is not necessary that the exercise of dominion and control by others be disproved; it is only necessary that the evidence support the jury's finding that Pedro Rivera exercised dominion and control over the weapon. The evidence was more than sufficient in this case to establish constructive possession by Pedro Rivera.

## CONCLUSION

We have considered the defendants' other claims and find them to be without merit. The judgments of the district court are affirmed.

This opinion has been circulated to the active judges of this court prior to filing.