**UNITED STATES of America, Appellee,**

v.

**Mara KIRSH & Joseph Kirsh,
Defendants–Appellants.**

**Nos. 4, 643, 644, 645, Dockets 93–1471,
93–1568, 93–1850, 93–1851.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 9, 1995.

Decided May 17, 1995.

---

Roland G. Riopelle, Asst. U.S. Atty., New York City (Mary Jo White, U.S. Atty. for the S.D. of N.Y., Alexandra Rebay, Asst. U.S. Atty., New York City, on the brief), for appellee.

William A. Gerard, Palisades, NY (A. Lawrence Washburn, Jr., New York City, on the brief), for defendant-appellant Mara Kirsh.

Richard P. Caro, Eugene, OR, for defendant-appellant Joseph Kirsh.

Before: KEARSE, McLAUGHLIN, and PARKER, Circuit Judges.

KEARSE, Circuit Judge:

Defendants Joseph and Mara Kirsh, husband and wife, appeal from judgments entered in the United States District Court for the Southern District of New York, following a jury trial before Kevin Thomas Duffy, *Judge*, convicting them of sending threatening communications through the mail, in violation of 18 U.S.C. § 876 (1988), of conspiring to do so, in violation of 18 U.S.C. § 371 (1988), and, as convicted felons, of possessing firearms, in violation of 18 U.S.C. § 922(g)(1) (1988). Joseph and Mara were sentenced principally to 87 months' and 63 months' imprisonment, respectively. On appeal, they contend principally that the admission at trial of statements made by Mara violated her rights under the Fifth Amendment and Joseph's rights under the Sixth Amendment. They also make numerous other challenges to their convictions and their sentences. For the reasons below, we affirm the judgments.

## I. BACKGROUND

Taken in the light most favorable to the government, the evidence at trial showed the following. Joseph and Mara Kirsh owned an apartment building at 239 Elizabeth Street in Manhattan. In 1988, after litigation with their tenants and the City of New York, the Kirshes were ordered to cease management of the building and not to enter it, on penalty

of contempt. Between November 1990 and February 1992, numerous threatening and harassing letters were mailed from New York City to various persons throughout the United States. The letters contained statements such as "I'm gonna blow you away," "[I]'ll blow your heads off," and "I will kill the fucking lot of you." All of the threatening letters were connected in some way to the Elizabeth Street block on which the Kirshes' building was located—they were either addressed to someone who lived or worked on that block, or they listed such a person as the return addressee.

In March 1992, agents of the Federal Bureau of Investigation ("FBI") obtained and executed an arrest warrant for Joseph and a search warrant for defendants' apartment. Among the items seized were 27 typewriters, including a Royal and a Smith Corona; a typewriter ribbon from the Smith Corona; white, legal-size Eaton Corrasable Bond paper; an address book containing the names and addresses of some of the individuals to whom the threatening letters were addressed; a typewritten list of the typewriters found in the apartment; and two rifles. Defendants were indicted on the charges described above, and most of the seized items were admitted in evidence at their trial.

The government also introduced into evidence 18 threatening letters, some of which had been written on white, legal-size Eaton Corrasable Bond paper, and 25 envelopes in which threatening letters had been sent. An FBI document examiner who had examined 122 such letters, testified that most of the letters and envelopes had been typed on a single Royal typewriter and that a number of the others had been typed on a Smith Corona. He testified that the Smith Corona typewriter ribbon seized from the Kirshes' apartment had been used to type the names, addresses, and return addresses on five of the envelopes. Further, the list of typewriters found in defendants' apartment shared certain characteristics with some of the threatening letters; in the list and in those letters, the letter "I" was used for the numeral "1".

One of the envelopes introduced bore the name "Mr. Joseph A. Kirsh" as the sender. In addition, a fingerprint expert testified that two of the letters and 12 of the envelopes bore Joseph's fingerprints. FBI Special Agent James Lazarski, who had participated in the search of defendants' apartment, testified that immediately after the search, Mara told him that she had helped type and compose the letters. (See Part II.A. below.)

The government also introduced the two rifles seized from the Kirshes' apartment, along with evidence that Joseph had purchased one of the rifles from a local gun collector in the fall of 1991 and subsequently asked whether the seller could supply ammunition. The parties stipulated that both Joseph and Mara had previously been convicted of felonies.

Joseph and Mara claimed that they had not written the letters. They contended that they had been framed, that the fingerprints found on the letters and envelopes were not Joseph's but were forged, and that Mara's statements to Lazarski after the search pertained not to threatening letters but to other letters that she and Joseph had written.

The jury convicted the Kirshes on all counts. They were sentenced as indicated above, and these appeals followed.

## II. DISCUSSION

### A. *Mara's Statements to Lazarski*

The most substantial contentions on appeal center on Mara's statements to Lazarski that she and Joseph had composed the threatening letters, that she had typed them, and that Joseph had sent them. Mara contends that the failure to suppress these statements violated her Fifth Amendment rights; Joseph contends that the admission of Mara's hearsay implication of him violated his Sixth Amendment right of confrontation. Only Joseph's confrontation argument is troublesome, but we conclude that the error was harmless.

### 1. *Mara's Fifth Amendment Claims*

Mara contends principally that the district court should have granted her motion to suppress her statements on the grounds that she was questioned in the absence of counsel and had not been advised of her *Miranda*

rights. Because Mara failed to establish that when she made the statements she was in custody or that she had invoked her right not to be questioned except in the presence of counsel, her motion was properly denied.

*Miranda* warnings are not required unless law enforcement agents interrogate a person who is in custody. *See Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966); *United States v. Mitchell,* 966 F.2d 92, 98 (2d Cir. 1992). The test used in determining whether a defendant was in custody is an objective one that (a) asks whether a reasonable person would have understood herself to be "subjected to restraints comparable to those associated with a formal arrest," and (b) "focuses upon the presence or absence of affirmative indications that the defendant was not free to leave." *Id.* (internal quotes omitted). An accused is in custody when, even "in the absence of an actual arrest, law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave." *Campaneria v. Reid,* 891 F.2d 1014, 1021 n. 1 (2d Cir.1989), *cert. denied,* 499 U.S. 949, 111 S.Ct. 1419, 113 L.Ed.2d 471 (1991); *see, e.g., United States v. Uribe–Velasco,* 930 F.2d 1029, 1033 (2d Cir.1991) (custody established where, *inter alia,* officer approached defendant from behind, identified himself and others as police officers, told defendant not to move, and kept his hand on defendant's back while questioning him, and eight other agents arrived on the run and positioned themselves all around with their guns drawn); *United States v. Morales,* 834 F.2d 35, 38 (2d Cir.1987) (a custodial setting is evidenced by "inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak").

"[A]fter a motion to suppress a confession has been denied, the evidence must be viewed in the light most favorable to the government." *United States v. Caba,* 955 F.2d 182, 185 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 130, 121 L.Ed.2d 84 (1992). The district court's factual findings in connection with its custody determination must be upheld unless clearly erroneous. *See, e.g., United States v. Mitchell,* 966 F.2d at 98; *see* *also United States v. Montilla,* 928 F.2d 583, 588–89 (2d Cir.1991).

At the hearing on Mara's suppression motion, Lazarski testified that the search of the Kirshes' apartment began early in the morning on March 26, 1992, when eight agents entered with guns drawn. Joseph and Mara were taken outside into the hall, where Joseph was handcuffed and arrested. Mara was not handcuffed or placed under arrest at that time. She was not permitted to enter the apartment during the execution of the search warrant, but she "was advised that she could leave if she liked and she could stay, if she liked." (Suppression Hearing Transcript, June 21, 1993 ("Supp.Tr."), at 41.) Though Mara was still in pajamas and did not ask to change into street clothes, "[s]he was walking up and down the corridor, went to the restroom, and left the floor at least on one occasion." (*Id.* at 66.)

After the mid-morning completion of the search, Mara signed an inventory of the items seized from the apartment and was asked some background questions. Lazarski testified that she was also asked "whether she had any knowledge or information concerning threatening letters sent by her husband, Joseph Kirsh, and she responded that she had typed the letters and that she had helped Joseph Kirsh compose the letters." (Supp.Tr. at 35; *see also id.* at 67 ("I asked Mara Kirsh if she knew anything about the threatening letters sent out by her husband, Joseph Kirsh.").) These questions were asked and answered when Mara and Lazarski were standing in the hallway; his gun was not drawn, and she was not handcuffed. Lazarski testified that after Mara said she had helped Joseph with the letters, she "made a statement to the effect of 'Oops, I shouldn't have said that, I shouldn't have told you that'" and "asked me something to the effect of 'Are you going to arrest me now?'" (*Id.* at 68.) He also testified that Mara never requested to speak to an attorney at any time prior to making these statements.

Lazarski testified that after the interview was terminated, Mara, *inter alia,* made a telephone call to a woman she addressed as "Mrs. Piel" and said "something to the effect

of 'I shouldn't have told the FBI about the letters, I shouldn't have said anything to them.'" (*Id.* at 69.) He testified that after Mara finished this call, she was placed under arrest.

The court accepted a proffer by Mara that Eleanor Piel, Esq., if summoned, would testify that she met Mara at the apartment on the morning of the search and that when she arrived, Mara was wearing pajamas. The court also accepted Mara's proffer that another attorney, if called as a witness, would testify that shortly before 8:00 a.m. on March 26, 1992, he received a telephone call from Mara, placed for her by an FBI agent, in which she told him that Joseph was being arrested; and that no more than 20 minutes later he received another call from her, again placed by an FBI agent, in which Mara said that she was under arrest.

The district court denied the motion to suppress, finding that Mara was not in custody at the time that she made the statements that she had helped Joseph to create the letters, and that she had had no objectively reasonable basis to believe she was in custody. This conclusion is not erroneous in light of Lazarski's testimony, which the court was free to credit, that the only restraint imposed on Mara was that she was not permitted to enter the apartment during the search; that she was not handcuffed; that she was told that she was free to leave if she wished; that she did leave the floor on at least one occasion; and that she asked, "Are you going to arrest me *now* " (emphasis added) *after* she made the statements she sought to have suppressed.

The court was also entitled to reject Mara's alternative Fifth Amendment claim in light of Lazarski's testimony that prior to making the statements in question she made no request that the questioning cease so that she could consult with an attorney.

### 2. *Joseph's Sixth Amendment Claim*

■ Though the district court did not err in refusing to suppress Mara's statements, this did not mean that those statements could properly be admitted in evidence against Joseph, for a defendant's right under the Sixth Amendment to confront the witnesses against him includes the right not to have the incriminating hearsay statement of a nontestifying codefendant admitted in evidence against him, *see, e.g., Bruton v. United States,* 391 U.S. 123, 136, 88 S.Ct. 1620, 1628, 20 L.Ed.2d 476 (1968) ("*Bruton* "); *Mason v. Scully,* 16 F.3d 38, 42 (2d Cir.1994). The confrontation problem may be avoided by redacting the codefendant's statement so that it is no longer connected to the nondeclarant defendant. *See United States v. Kyles,* 40 F.3d 519, 526 (2d Cir.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 1419, 131 L.Ed.2d 302 (1995); *United States v. Tutino,* 883 F.2d 1125, 1135 (2d Cir.1989), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990).

■ The admission of a codefendant's statement in violation of the *Bruton* rule is not ground for reversal, however, where "the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error." *Schneble v. Florida,* 405 U.S. 427, 430, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340 (1972); *see also Brown v. United States,* 411 U.S. 223, 231, 93 S.Ct. 1565, 1570, 36 L.Ed.2d 208 (1973) ("We reject the notion that a *Bruton* error can never be harmless."); *Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 1728–29, 23 L.Ed.2d 284 (1969); *United States v. Kyles,* 40 F.3d at 527 (error harmless where "other, properly admitted evidence sufficiently prove[d] the elements of the crime for which the defendant was convicted, and there [wa]s no reasonable probability that the *Bruton* violation infected the verdict").

At the trial in the present case, Lazarski's testimony, on direct examination by the Assistant United States Attorney ("AUSA"), included the following:

Q. What did you ask her—after you finished with the background questions, what else did you ask her?

A. I asked her if she had any information or knowledge concerning the threatening letters *sent out by Joseph Kirsh.*

(Trial Transcript ("Tr.") at 152 (emphasis added).) Over Joseph's objection, Lazarski was then permitted to testify that Mara "responded that she had typed the letters and that she had composed the letters." (*Id.*)

This testimony, hearsay as to Joseph, elicited by the AUSA's inappropriate initial question to Lazarski, clearly inculpated Joseph because Mara had responded directly to a question whose expressed premise was that the threatening letters had been sent by Joseph. The AUSA had previously elicited at the suppression hearing that Lazarski's question to Mara was "whether she had any knowledge or information concerning threatening letters *sent by her husband, Joseph Kirsh*" (Supp.Tr. at 35 (emphasis added); *see also id.* at 67 (on cross-examination, Lazarski reiterated that he had asked whether "she knew anything about the threatening letters *sent out by her husband, Joseph Kirsh*" (emphasis added))); and Lazarski testified that Mara's response was that "she had typed the letters and that she had *helped Joseph Kirsh* compose the letters" (*id.* at 35 (emphasis added)). Thus, the AUSA should have known that the agent's response at trial would, explicitly or implicitly, include the part of Mara's statements that dealt with actions by Joseph and thereby infringe Joseph's confrontation rights. Even had there been no prior testimony at a suppression hearing, we would expect a properly prepared government attorney to know prior to trial what question the agent had asked and to take pains where necessary, as it was here, to avoid posing at trial a question whose proper response would trespass on a defendant's rights. The government should have avoided the infringement here by framing its question so as to call only for statements by Mara about her own actions, and it should generally forewarn its witness not to stray, in answering, beyond the narrowly framed question. Though the government claims that it made such an effort here and that it intended to elicit from Lazarski only that Mara admitted her own actions in composing and typing the letters, since the government knew that Lazarski had posed his question to Mara in terms of "threatening letters sent by her husband, Joseph Kirsh," no thoughtful attempt at limitation is re-

flected in the open-ended question "What else did you ask her?"

Nonetheless, we are persuaded that this *Bruton* error was harmless, for Mara's statements were not important to the government's case against Joseph. The evidence that the threatening letters had come from the Kirshes' apartment was overwhelming, including proof that the address book found there listed some of the addresses to which the letters were sent; that a typewritten list found there had typographic characteristics in common with some of the threatening letters; and that the typewriter ribbon from the Smith Corona found there bore the imprint of the text found on some of the envelopes in which the letters were sent. The properly admitted evidence that Joseph himself had been responsible for sending the letters was abundant, including proof that at least one of the letters listed "Mr. Joseph A. Kirsh" as the sender and that Joseph's fingerprints were found on a number of the recovered letters and envelopes. We note also that the trial judge immediately gave the jury a limiting instruction, stating that Mara's statements were

> being offered only against Mara Kirsh. It has nothing whatsoever to do with Joseph Kirsh, and you have to separate these people. Even though they're man and wife, they are to be treated as always as individuals. The testimony is only directed to Mara Kirsh. It is not being offered against Joseph Kirsh at all.

(Tr. at 153.) We conclude that the government's error in eliciting Mara's hearsay inculpation of Joseph was harmless beyond a reasonable doubt.

### B. *Other Challenges to the Convictions*

The Kirshes' other challenges to their convictions focus principally on (1) their competence to stand trial, (2) alleged violations of the Speedy Trial Act, 18 U.S.C. §§ 3161–3174 (1988) (the "Act"), (3) the trial court's instructions to the jury, (4) the effectiveness of counsel, and (5) allegedly inflammatory conduct by the trial court. None of these contentions, discussed below, has merit. Their other contentions do not warrant mention.

### 1. *The Competency Determination*

Prior to trial, defendants' respective attorneys asked the court to order psychiatric examinations to determine defendants' competence to stand trial. The Kirshes indicated that they objected to any psychological examination and were seeking new counsel. The court granted the attorneys' applications and adhered to its decision after Mara obtained new counsel, A. Lawrence Washburn, Jr., who, joined by Joseph *pro se,* moved to have the examination orders rescinded, insisting that the Kirshes were competent.

Joseph and Mara met with a psychiatrist on September 21 and 23, respectively, but on the advice of Washburn, each refused to cooperate, claiming a Fifth Amendment right to remain silent. The psychiatrist submitted a report stating that although she "fe[lt] comfortable in stating that Mr. and Mrs. Kirsh do not lack the intellectual capacity to understand the charges and proceedings," she was "unable to conclude on the subject of competency to stand trial and would suggest further observation and evaluation in a suitable institution."

After appointing new counsel for Joseph and rejecting Washburn's attempt to represent both defendants, on October 5, 1992, the court remanded the Kirshes to the custody of the Attorney General for 30 days for observation to determine their competency, *see* 18 U.S.C. §§ 4241, 4247(b) (1988). The Bureau of Prisons thereafter submitted a psychiatric report on Mara, dated November 6, 1992, and one on Joseph, dated November 30, 1992; the reports noted, respectively, that Mara and Joseph had continued to be uncooperative, making it more difficult to render an opinion. However, the November 6 report concluded that there was "no evidence Mara Kirsh is currently suffering from a mental disease or defect which would render her unable to understand the nature and consequences of the proceedings against her or to assist properly in her own defense." The November 30 report stated that Joseph evidenced "apparently normal behavior" and that "[b]ased upon the degree of participation in his case which he has already demonstrated, it appears that Mr. Kirsh has a grasp of the legal proceedings against him and has a sufficient ability to relate appropriately and relevantly to his attorney."

In the meantime, on October 1, 1992, the Kirshes had filed interlocutory appeals challenging the district court's orders directing their psychiatric examinations. On April 27, 1993, this Court dismissed the appeals; our mandate issued on May 20. On May 11, 1993, the district court, indicating that it had reviewed the various psychiatric reports, found the Kirshes competent to stand trial. The court stated that it saw no basis on which to find them incompetent. Seven months later, having observed the defendants at trial, the district court reaffirmed its view that they were competent. Noting Washburn's denial of their incompetency (*see* Sentencing Transcript, December 2, 1993 ("Sent.Tr."), at 6 ("I'm asking you to find that they are competent"); *id.* at 7 ("I have done everything to show you that they are competent")), the court stated, "I have no reason and can find no reason to find them anything other than competent" (*id.*).

 On these appeals, the Kirshes apparently still make no claim that they were not competent to stand trial; but they contend that the case should be remanded because the district court found them competent without conducting a full evidentiary hearing. Even had defendants claimed that they were not competent, this contention is meritless on the record before us. A district court must conduct an evidentiary hearing to determine the competency of a defendant "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). The question of competency focuses on a defendant's abilities at the time of trial; the failure to conduct a full competency hearing is not a ground for reversal when the defendant appeared to be competent during trial, and the district court's view of the defendant's competency based on its observations at trial is entitled to deference. *See United States v. Vamos,* 797 F.2d 1146, 1150 (2d Cir.1986), *cert. denied,* 479 U.S. 1036, 107

S.Ct. 888, 93 L.Ed.2d 841 (1987). A failure by trial counsel to indicate that the defendant had any difficulty in assisting in preparation or in comprehending the nature of the proceedings "provides substantial evidence of the defendant's competence." *Id.*

In the present case, there was no basis on which the district court was required, following receipt of the psychiatric reports, to conduct an evidentiary hearing as to the Kirshes' competence. The Kirshes and Washburn consistently insisted that the Kirshes were competent, and the reports presented no basis on which to conclude otherwise. When the court made its pretrial finding of competence, neither defendant objected, or asked to present evidence, or asked to question the psychiatrists who had submitted reports, or requested any other sort of evidentiary hearing. After trial, Washburn repeatedly urged the court to find defendants competent. Defendants' present arguments are frivolous.

### 2. *Speedy Trial*

In the district court, defendants moved unsuccessfully to dismiss the indictment on Speedy Trial Act grounds, contending, *inter alia,* that once the court received the last psychiatric report on December 1, 1992, the matter was under advisement and, under 18 U.S.C. § 3161(h)(1)(J), the court was entitled to exclude only the next 30 days, not the entire period until its decision on May 11. This contention has no merit.

The Act, which requires generally that the trial of an indicted defendant commence within 70 days from the date of the filing of the indictment, *see* 18 U.S.C. § 3161(c)(1), permits the exclusion of various periods of delay, including delay resulting from "any interlocutory appeal," *id.* § 3161(h)(1)(E). *See also United States v. Rivera,* 844 F.2d 916, 919–20 (2d Cir.1988) (period excludable with respect to an interlocutory appeal ends when the appellate court's mandate issues). Since the Kirshes' appeals from the examination orders were pending from October 1, 1992, to May 20, 1993, that period was properly excluded.

### 3. *The Instructions to the Jury on the Firearms Counts*

Defendants contend that their convictions for firearms possession should be vacated because the district court failed to instruct the jury that, in order to convict under 18 U.S.C. § 922(g)(1), it must find that defendants knew the rifles they possessed had traveled in interstate commerce. This argument is without merit.

The requirement that the firearms have an interstate nexus is a jurisdictional requirement that is "satisfied merely upon a showing that the possessed firearm has previously ... travelled in interstate commerce." *United States v. Carter,* 981 F.2d 645, 648 (2d Cir.1992) (internal quotes omitted), *cert. denied,* —— U.S. ——, 113 S.Ct. 1827, 123 L.Ed.2d 456 (1993). A defendant's knowledge or ignorance of the interstate nexus is irrelevant. *See, e.g., United States v. Dancy,* 861 F.2d 77, 81 (5th Cir.1988). Accordingly, the court was not required to give the instruction requested by the Kirshes.

### 4. *Claims of Ineffective Assistance of Counsel*

The Kirshes claim that their Sixth Amendment rights to the effective assistance of counsel were violated. To prevail on such a claim, a defendant must (1) show that counsel's conduct fell below "an objective standard of reasonableness" under "prevailing professional norms," and (2) "affirmatively prove prejudice." *Strickland v. Washington,* 466 U.S. 668, 688, 693, 104 S.Ct. 2052, 2064–65, 2067, 80 L.Ed.2d 674 (1984). In assessing the first element, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. at 2065. Thus, the failure to make a meritless argument does not rise to the level of ineffective assistance, *see United States v. Javino,* 960 F.2d 1137, 1145 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 477, 121 L.Ed.2d 383 (1992), and "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," *Strickland v. Washington,* 466 U.S. at 690, 104 S.Ct. at 2066; *United States v. Eisen,* 974 F.2d 246, 265 (2d

Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1619, 123 L.Ed.2d 178 (1993); *United States v. Aguirre,* 912 F.2d 555, 560 (2d Cir.1990). Where a defendant establishes that her attorney has an unconsented-to conflict of interest, however, as where the attorney represents codefendants with divergent interests, prejudice will be presumed. *See generally United States v. Curcio,* 694 F.2d 14 (2d Cir.1982); *United States v. Curcio,* 680 F.2d 881 (2d Cir.1982).

▆▆▆ Mara first contends that Washburn represented both her and Joseph, creating an actual conflict of interest and raising a presumption of prejudice. This claim is without merit because Washburn did not represent Joseph in the present case. Washburn apparently was Joseph's attorney in a civil proceeding and acted as Joseph's special counsel in connection with a habeas corpus proceeding; but though Washburn stated that he wanted to represent both defendants in the present prosecution, the court forbade him to do so. Instead, Joseph had his own appointed attorney throughout, at first William J. Stampur, then Gerald E. Bodell. Bodell filed motions for Joseph, delivered opening and closing addresses to the jury, cross-examined witnesses, and spoke on Joseph's behalf at sentencing. The fact that Joseph and Mara may have decided to pursue a joint defense strategy in which Washburn acted as lead counsel, does not mean that Washburn represented both defendants. Mara failed to show a conflict of interest.

Mara's other claims that Washburn's performance fell below objective standards of reasonableness are also meritless. They focus on his election not to pursue certain motions that lacked merit or on other decisions that must be considered strategic.

▆▆▆ Joseph's argument that Bodell's assistance was ineffective for failure to call fingerprint experts to discuss the possibility of fingerprint forgery must similarly be rejected. Bodell's decision not to put on testimony as to fingerprint forgery, if indeed such testimony was available (Mara's expert at the sentencing stage expressed the opinion that there was no evidence that the fingerprints at issue here had been forged), was plainly a tactical decision and hardly bespeaks professional incompetence.

### 5. *Allegedly Inflammatory Conduct by the Trial Judge*

Joseph also contends that after the trial judge fitted a "gun clip" into one of the rifles seized from defendants' apartment, the judge engaged in unfair conduct by "pointing the rifle towards the jury, aiming it above their heads, cocking the hammer and then pulling the trigger." (Joseph's main brief on appeal at 50.) Joseph provided no citation to the record to support this allegation, and in its responding brief, the government stated that the allegedly improper conduct did not occur. In his reply brief, Joseph made no effort to refute the government's assertion or to provide a citation for his own assertion.

The record indicates that the court inserted the clip into the rifle after the witness stated that he did not know how to do so. We have seen no indication in the record that the court either aimed the rifle, cocked the hammer, or pulled the trigger. Joseph's claim of prejudicial conduct by the trial judge is rejected for lack of a factual foundation. We regard the making of such allegations without any semblance of citation to the record as a substantial disservice to both the trial court and the reviewing court.

### C. *Sentencing*

In calculating defendants' sentences under the federal Sentencing Guidelines ("Guidelines"), the court, *inter alia,* enhanced their offense levels pursuant to Guidelines § 2A6.1(b)(1) for conduct evincing an intent to carry out the threats made in the letters; it further increased Joseph's offense level pursuant to Guidelines § 3C1.1 for obstruction of justice. Accepting such findings of fact as are not clearly erroneous, and "giv[ing] due deference to the district court's application of the guidelines to the facts," *United States v. Davis,* 967 F.2d 84, 88–89 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 356, 121 L.Ed.2d 270 (1992) (internal quotes omitted); *see* 18 U.S.C. § 3742(e)(4) (1988), we see no error in these decisions.

### 1. *Intent To Carry Out Threats*

 With respect to convictions for making threatening communications, Guidelines § 2A6.1(b)(1) provides for a six-step increase in offense level "[i]f the offense involved any conduct evidencing an intent to carry out [the] threat[s]." *Id.* To trigger this section, the conduct proffered as probative of such an intent must have occurred "either contemporaneously with or after the threat." *United States v. Hornick*, 942 F.2d 105, 108 (2d Cir.1991), *cert. denied*, 502 U.S. 1061, 112 S.Ct. 942, 117 L.Ed.2d 112 (1992).

The district court here found that "the guns were in the apartment during the time the threatening letters were being prepared and sent out" (Sent.Tr. at 11), and it concluded that the clear preponderance of the evidence established to the court's satisfaction "that these people possessed weapons for a reason.... They possessed the weapons to use" (*id.* at 19). Noting that the threatening letters contained language such as "I'm going to blow you away" (*id.* at 20), the court found that the Kirshes possessed the weapons for the purpose of carrying out the threats made in the letters. It rejected as not credible the claim that the guns were meant for a legitimate activity such as hunting.

 The record adequately supports the district court's findings. The trial evidence indicated that the letters, many threatening the use of firearms to kill the addressees, were sent between November 1990 and February 1992. The guns were present in the Kirshes' apartment when they were arrested in March 1992; Joseph had purchased one of them in the fall of 1991 and thereafter asked whether the seller could supply him with ammunition. It was well within the district court's province to find that defendants' purchasing of firearms and inquiring about ammunition during the period in which they were sending letters threatening to shoot sufficiently evinced an intent to carry out their threats. The § 2A6.1(b)(1) enhancement was proper.

### 2. *Obstruction of Justice*

The court also increased Joseph's offense level by two steps pursuant to Guidelines § 3C1.1 for obstruction of justice, based on its finding that Joseph had caused a false affidavit to be filed in support of his postconviction application for release on bail. The affidavit, submitted by Washburn as Joseph's special counsel in connection with a habeas corpus application, sought Joseph's release on the ground that "undisputed medical facts" showed that his release pending appeal was "urgently required to preserve [his] life" because Joseph was "now near death" (Washburn Affidavit dated August 9, 1993, ¶ 3), after suffering "a heart attack" upon his arrival at the Otisville Correctional Facility ("Otisville") (*id.* ¶ 4). In a subsequent affidavit, Washburn stated that his representation was based on Joseph's own statement to Washburn. (Washburn Affidavit dated November 1, 1993, ¶ 31.) The government, however, submitted medical evidence from Otisville that though Joseph had complained of chest pains upon his arrival, he was promptly examined and in fact had not had a heart attack; indeed he engaged in ambulatory exercise on the afternoon of his arrival; and he had not had a heart attack at any time since his incarceration.

 Section 3C1.1 provides for a two-step enhancement where a defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." Such conduct includes "committing, suborning, or attempting to suborn perjury," *id.* Application Note 3(b), "escaping or attempting to escape from custody before trial or sentencing," *id.* Application Note 3(e), and "providing materially false information to a judge," *id.* Application Note 3(f). An intent to provide false information to be used at sentencing can establish an intent to obstruct justice. *See United States v. Hendron*, 43 F.3d 24, 26 (2d Cir.1994) (per curiam). To come within this section, the misrepresentation must have been made willfully and knowingly, with the intent to interfere with the administration of justice or affect a sentencing determination. *See United States v. Rivera*, 971 F.2d 876, 894 (2d Cir.1992). Allegedly false testimony is to be evaluated in the light most favorable to the defendant, with the court resolving in favor of the defendant all conflicts as to

which it has no firm conviction. *See* Guidelines § 3C1.1 Application Note 1; *United States v. Cunavelis,* 969 F.2d 1419, 1423 (2d Cir.1992).

■ The district court found that the representations made in support of Joseph's bail motion were deliberately false, and we see no error. Plainly there was evidence to support the court's finding that the statements that Joseph was near death and that his release was urgently needed to save his life were false. Equally plainly, those statements were designed to influence the court to grant bail. There can be no question that the making of the misrepresentations for that purpose was willful. Joseph's claim that he had no intention of attempting to escape, but merely wanted to develop medical evidence relevant to sentencing, is wide of the mark, for the obstruction enhancement is equally warranted where the falsehood was intended to further the creation of a false record for sentencing. We conclude that the court properly applied § 3C1.1.

## CONCLUSION

We have considered all of the Kirshes' contentions on these appeals and have found in them no basis for reversal. The judgments of the district court are affirmed.