UNITED STATES of America, Appellee,

v.

Michael A. CASCIANO, Defendant–Appellant.

No. 1677, Docket 96–1695.

United States Court of Appeals, Second Circuit

Argued May 5, 1997.

Last supplemental brief filed July 31, 1997.

Decided Aug. 18, 1997.

Ronald J. Pelligra, Syracuse, NY, for Defendant–Appellant.

John G. Duncan, Assistant United States Attorney for the Northern District of New York (Thomas J. Maroney, United States Attorney for the Northern District of New York, Diane Rosenfeld, Washington, DC, Senior Counsel, Violence Against Women Office, Department of Justice, of Counsel, for Appellee).

Julie Goldscheid, New York City, Staff Attorney, National Organization of Women, Legal Defense & Education Fund, for Appellee, as Amicus Curiae.

Before: FEINBERG, OAKES and LEVAL, Circuit Judges.

FEINBERG, Circuit Judge:

This appeal is apparently the first to reach us involving 18 U.S.C. § 2262(a)(1), part of the recently enacted Violence Against Women Act. Defendant Michael Casciano appeals from a judgment of conviction, after a jury trial in the United States District Court for the Northern District of New York, Howard G. Munson, J., for traveling across a state line and violating a protection order. The judge sentenced Casciano to a term of imprisonment of 37 months, to be followed by three years of supervised release. Casciano claims that he was denied due process, that the judge erred in charging the jury and that the guidelines were applied improperly to determine his sentence. For reasons set forth below, we affirm.

## I. Background

Viewing the evidence in the light most favorable to the government, the jury could have found the following. In early March 1995, Casciano met a woman named Susan Keezer in a popular downtown nightclub area in Boston, Massachusetts. At the time, Casciano was on probation, having recently been released from prison where he had served 18 months for violating the terms of another protection order obtained by an unrelated victim. Keezer and Casciano apparently dated for approximately two and a half weeks before Keezer sought to break off the relationship because Casciano had, in her view, become very jealous and possessive. Casciano attempted without success to persuade her to continue the relationship. He then began to engage in a pattern of intrusive, harassing and threatening behavior. On the night Keezer informed Casciano that she was no longer interested in continuing their relationship, Keezer returned to her Lowell, Massachusetts home, only to find Casciano waiting in her car. Early the next morning, Casciano rang the doorbell of the house, where Keezer lived with her mother. Keezer told him to go away. Casciano asked if he could just use the telephone and toilet.

When Keezer let him in, Casciano refused to leave for about an hour before Keezer's mother told him to go. Keezer reported the incident to the local police.

In April 1995, Casciano frequently waited by Keezer's car when she left work, despite Keezer's telling him repeatedly that she wanted to be left alone. When she notified security at her place of work to watch for him, Casciano escalated his harassing behavior. On one occasion, he barged into her office at work, using abusive language, and physically restrained her from either leaving or using the phone. Casciano was eventually escorted from the building by two of Keezer's co-workers.

Keezer notified the Cambridge, Massachusetts police of the workplace incident. On April 25, 1995, pursuant to chapter 209A of the General Laws of the Commonwealth of Massachusetts, Keezer obtained an abuse prevention order (usually referred to hereafter as a protection order) from the Lowell District Court. The order was issued without advance notice to Casciano based on the court's determination that there was a "substantial likelihood of immediate danger of abuse." The substantive provisions of the order prohibited Casciano from, among other things, harming or attempting to harm Keezer physically; placing her in fear of imminent serious physical harm; contacting Keezer in person, by telephone, in writing or otherwise, either directly or through someone else; coming within 100 yards of her; and visiting Keezer's residence or workplace. The order provided, in the largest printed letters on the page, that "VIOLATION OF THIS ORDER IS A CRIMINAL OFFENSE punishable by imprisonment or fine or both." The order also fixed a hearing date of May 10, 1995. Casciano was notified of the protection order, its contents and the date and location of his court appearance by his probation officer for his earlier offense. He was personally served with the order on April 27, 1995. That order expired on May 10, 1995.

In late April 1995, Keezer travelled to Syracuse, New York to interview for admission to the doctoral program at the SUNY Health Science Center. Although Keezer did not tell Casciano about the trip or where she would be staying, he was waiting for her at the motel when she arrived. Casciano told her that the Massachusetts restraining order was no good in New York, so she shouldn't bother calling the police. Casciano then admitted to Keezer that he was on parole, and that he would probably be sent back to jail as a result of the protection order. He threatened to kill himself if that happened. Keezer allowed Casciano to sleep in her car that night, and gave him a lift when she drove back to Boston the next day.

Keezer and Casciano spoke many times over the next month. Keezer explained that she thought that keeping in contact with Casciano might enable her "to end this in a peaceful way." By the end of May, however, Keezer again attempted to break off contact with Casciano. He tried to dissuade Keezer, even forcibly restraining her from leaving his apartment. When that proved unsuccessful, Casciano resumed his harassing behavior.

On June 9, 1995, Keezer obtained a second ex parte abuse prevention order, identical in its substantive provisions to the first, this time from the Cambridge District Court. The order set a hearing date for June 23, 1995. Boston police attempted to serve the order upon Casciano several times at his apartment, apparently without success. Keezer's testimony at trial, however, indicated that Casciano knew of the order and the hearing date. Keezer testified that Casciano called her on June 9 at her workplace. She told him that he was not supposed to call her. Keezer stated that Casciano responded, "I can't believe you got another 209A[1] against me." Keezer then testified, "I told him that, yes, I did, and he said he was going to see me anyway, and I said that, 'You can see me at the Cambridge Court on June 23rd.'" According to Keezer, Casciano responded that he would never be with Keezer in court

---

1. The reference is clearly to ch. 209A of the Massachusetts general law, which sets forth the procedures for issuing an abuse prevention order. To further demonstrate defendant's consid- erable knowledge of Massachusetts abuse prevention orders, the government introduced into evidence the earlier, unrelated 209A order that defendant had violated.

and that the order was no good if not served on him.

Casciano failed to appear at the June 23 hearing. At that time, the protection order was continued to July 7, 1995, and another hearing was set for that date. Further service was attempted between June 23 and July 7, but Casciano was not home on any of these occasions. Boston Police Lieutenant John Kervin testified at trial, and the Boston Police Abuse Prevention Order Log Book shows, that the order was served by being placed under the door of Casciano's apartment on June 26, and that numerous unsuccessful attempts at personal service were made subsequently. Casciano contends that he had by this time abandoned the apartment, and thus did not receive notice of the July 7 hearing. One of Casciano's sisters testified, however, that when she went to clear out his belongings from the apartment on June 28, the notice was not there on the floor. Lieutenant Kervin did not testify whether the notice was also mailed.

Casciano failed to appear at the July 7 hearing, and the order was extended to June 10, 1996. There is no evidence that Casciano was ever personally served with a copy of the extended order. Meanwhile, Casciano continued to harass Keezer. Keezer testified that he threatened to kill any male she was with, and threatened to kill Keezer's brother when he answered the phone at her house. Keezer also testified that Casciano made an average of about 100 phone calls to her a week at work, with a record of approximately 200 calls in a single day. Keezer and her co-workers kept logs of the calls. On at least two occasions during this period, Casciano was reminded that he was not supposed to call Keezer and that in doing so he was in violation of the protection order. Casciano responded that he had violated it hundreds of times before and nothing had happened to him and that he wasn't too worried about it.

In August 1995, Keezer moved to Syracuse to begin her doctoral program. In early September, Casciano appeared in Syracuse, where he continued to engage in harassing behavior in violation of the Cambridge protection order. He discovered Keezer's unlisted telephone number and initiated dozens of calls, including three rambling, expletive-filled messages recorded on Keezer's answering machine. He sent electronic mail messages to Keezer's account. He approached Keezer in the library at the Health Science Center and tried to kiss her. He appeared in a lecture hall where Keezer was attending class, and then chased her after she fled, abandoning her only after she sought refuge in a professor's office and campus security was called.

Casciano was finally arrested by Syracuse police in September 1995. Even while he was in custody, Casciano managed to make dozens of collect phone calls to Keezer until a magistrate suspended his phone privileges.

In September 1995, Casciano was charged with Interstate Violation of an Order of Protection, 18 U.S.C. § 2262, and in April 1996 was tried before a jury in Syracuse. At trial, Judge Munson left it to the jury to determine whether Casciano had received reasonable notice of the Cambridge protection order and hearing under Massachusetts law. The jury found Casciano guilty as charged. Thereafter, Casciano moved for a judgment of acquittal under Fed.R.Crim.P. 29, or for a new trial under Fed.R.Crim.P. 33. In May 1996, the district court denied the motion in a Memorandum–Decision and Order. United States v. Casciano, 927 F.Supp. 54 (N.D.N.Y. 1996). At Casciano's sentencing hearing in September 1996, the court determined that the sentencing guideline for Threatening Communications, U.S. Sentencing Commission Guidelines Manual § 2A6.1 (Nov. 1, 1995), was most closely analogous to Casciano's crime, and imposed the already-mentioned sentence of 37 months in prison, to be followed by three years of supervised release.

This appeal followed. After the appeal was argued, we requested further briefing from the parties. We also requested amicus briefs from two organizations, only one of which has filed a brief.

## II.   Discussion

On appeal, Casciano contends that he was denied due process because he did not receive reasonable notice and an opportunity to

be heard with respect to the Cambridge protection order. He further argues that the district court erred in giving the jury a charge that allowed it to conclude that Casciano had received reasonable notice on the basis of facts that fell short of those required under Massachusetts law. We review both challenges to the conviction de novo. *United States v. Cruz–Flores,* 56 F.3d 461, 463 (2d Cir.1995) (due process); *United States v. Dove,* 916 F.2d 41, 45 (2d Cir.1990) (erroneous jury instruction). Finally, Casciano argues that the judge erred in determining the "most analogous offense guideline" for his offense. U.S.S.G. § 2X5.1. This involves the district judge's application of a guideline to the facts of a case, to which 18 U.S.C. § 3742(e) mandates that we give "due deference." *United States v. Versaglio,* 96 F.3d 637, 638 (2d Cir.1996); *United States v. Cefalu,* 85 F.3d 964, 968 (2d Cir.1996).

The Violence Against Women Act (VAWA), enacted as Title IV of the Violent Crime Control Act of 1994, 108 Stat. 1796, Pub.L. 103–322; see 1994 U.S.Code Cong. and Adm.News (U.S.C.C.A.N.) 1801, 1849 et seq., is a comprehensive statute designed to provide women nationwide greater protection and recourse against violence and to impose accountability on abusers. See P. Paziotopoulos, Violence Against Women Act: Federal Relief for State Prosecutors, 30–Jun Prosecutor 20 (1996) (available on Westlaw). Subtitle B of VAWA, of which § 2262 is a part, is entitled "Safe Homes for Women". The subtitle creates two new federal domestic violence crimes, directs that full faith and credit be given by the states to protection orders, and mandates restitution related to the federal crimes. The subtitle also provides for millions of dollars for shelters and youth education programs, and to encourage pro-arrest policies. Id.; see also 1994 U.S.C.C.A.N. at 1851–52.

Casciano was convicted of violating 18 U.S.C. § 2262(a)(1). That section makes it a federal offense to

> travel[ ] across a State line ... with the intent to engage in conduct that—
>
> (A)(i) violates the portion of a protection order that involves protection against credible threats of violence, repeated harassment, or bodily injury to the person or persons for whom the protection order was issued; or
>
> (ii) would violate this subparagraph if the conduct occurred in the jurisdiction in which the order was issued; and
>
> (B) subsequently engage[ ] in such conduct....

Casciano apparently does not challenge the sufficiency of the evidence showing that his conduct in Syracuse ran afoul of the statute. Instead, he first contends that the protection order he violated is invalid.

Casciano argues that in order to prove a violation of § 2262(a)(1), there must be a valid underlying protection order. Subsection (2) of the same section provides that a person "who causes a spouse or intimate partner to cross a State line ... by force, coercion, duress, or fraud" and thereafter engages in conduct "in violation of a *valid* protection order issued by a State" also commits a crime. (emphasis added). Oddly, the word "valid," which appears in subsection (2), does not appear in subsection (1), the statutory provision involved in this case. Nevertheless, despite this omission, we assume without deciding that subsection (1) also requires the existence of a valid underlying protection order.[2]

A. Who decides the validity of the protection order?

■ Casciano also argues to us in his supplemental brief that the issue of the validity of the order is one for the jury, as opposed to

---

2. In its supplemental brief, the government contends, among other things, that only the *existence,* but not the *validity* (under either state or federal law or even the United States Constitution), of the protection order is open to question in a federal prosecution under § 2262(a)(1). Compare *Custis v. United States,* 511 U.S. 485, 490–91, 114 S.Ct. 1732, 1735–36, 128 L.Ed.2d 517 (1994) (holding that in a prosecution under

18 U.S.C. § 924(e), which provides for enhanced sentences based on certain prior convictions, a defendant cannot challenge the validity of the underlying conviction). As will be seen below, we find it unnecessary to explore this argument further because in this case the district judge did justifiably find that the protection order was valid.

the judge, to decide. The statute at issue here is new, and we have found no case specifically discussing whether the judge or jury should decide if a protection order was validly issued. In *United States v. Von Foelkel,* 1997 WL 67795 *2 (N.D.N.Y. Feb. 10, 1997), Judge Pooler did not submit the issue to the jury, apparently on the view that it is not one for the jury to decide.

In the absence of direct precedent, we look for analogy. In a criminal contempt proceeding, the validity of the underlying court order is a question for the judge, not the jury, to determine. E.g. *United States v. Ray,* 683 F.2d 1116, 1127 (7th Cir.1982); *United States v. Brummitt,* 665 F.2d 521, 526 (5th Cir.1981); *United States v. Bukowski,* 435 F.2d 1094, 1108 (7th Cir.1970); see also L. Sand, et al., 1 Modern Federal Jury Instructions ¶ 20.02 at 20–27 (instructing jury "as a matter of law that this order was lawful and proper in every respect and, further, that it did not violate any constitutional or other legal rights of the defendant"). Similarly, in *Cox v. United States,* 332 U.S. 442, 68 S.Ct. 115, 92 L.Ed. 59 (1947), the Supreme Court upheld convictions for absence without leave from a civilian public service camp based on selective service board classifications that appellants were not duly ordained ministers, and rejected appellants' claim that the issue of their status should have been submitted to the jury. The Court said that "[t]he concept of a jury passing independently on an issue previously determined by an administrative body or reviewing the action of an administrative body is contrary to settled federal administrative practice; the constitutional right to jury trial does not include the right to have a jury pass on the validity of an administrative order." Id. at 452–53, 68 S.Ct. at 120; see also *United States v. Sundstrom,* 489 F.2d 859, 863 (2d Cir.1973); cf. 5 James Wm. Moore, Moore's Federal Practice ¶ 38.36[3] at 38–341 (2d ed. 1996) ("Usually questions as to whether the court has jurisdiction of the person [in civil cases] . . . are separate from the merits and can be disposed of as preliminary matters on motion under Rule 12, and no general right to a jury trial of such questions exists.").

The government in its supplemental brief cites cases in other contexts where courts have held that a defendant cannot challenge in a federal prosecution the validity of an underlying conviction or order. For instance, courts have held that under the recently enacted Child Support Recovery Act, 18 U.S.C. § 228, a defendant charged with willful failure to pay past-due support obligations could not relitigate the validity of a state support order. *United States v. Johnson,* 114 F.3d 476, 482–83 (4th Cir.1997); *United States v. Bailey,* 115 F.3d 1222, 1232 (5th Cir.1997); but see *United States v. Lewis,* 936 F.Supp. 1093, 1101–03 (D.R.I.1996). The government also notes that the Supreme Court has held that a conviction under the predecessor to 18 U.S.C. § 922(g)(1), which makes it a crime for a felon to possess a firearm, is valid "despite the fact that the predicate felony may be subject to collateral attack on constitutional grounds." *Lewis v. United States,* 445 U.S. 55, 65, 100 S.Ct. 915, 921, 63 L.Ed.2d 198 (1980).

We realize that none of the authority cited above on this issue is directly on point, but we are comforted by the thought that it is unlikely that in prosecutions under § 2262(a)(1) Congress intended federal juries to explore the intricacies of 50 state statutes relating to service of process. See generally C. Klein and L. Orloff, Providing Legal Protection for Battered Women: An Analysis of State Statutes and Case Law, 21 Hofstra L.Rev. 801, 877–80 (1993) (collecting state statutory requirements for service of process). We hold, as the government contends in one of its alternative arguments, that the question whether a protection order was validly issued is at most an issue for the judge to resolve.[3] In accordance with our assumption that the validity of the Massachusetts protection order was at issue in this prosecution and was to be decided by the judge, we thus turn to the merits of Casciano's challenges to the order.

---

**3.** As indicated above, see note 2, the government's primary argument is that the validity of the protection order (as distinguished from its existence) is not a relevant issue in a federal prosecution under § 2262(a)(1).

B. Due Process

■ In order for the Cambridge protection order to be valid, due process requires that the Massachusetts trial court must have obtained personal jurisdiction over Casciano by service of process giving him notice and an opportunity to be heard. *Pennoyer v. Neff,* 95 U.S. 714, 733, 24 L.Ed. 565 (1877) (requiring service of process for personal jurisdiction); *Griffin v. Griffin,* 327 U.S. 220, 228–29, 66 S.Ct. 556, 560–61, 90 L.Ed. 635 (1946) (due process requires that a person be given notice and an opportunity to be heard before a judgment or order can be given full faith and credit in another jurisdiction). The Due Process Clause requires that notice be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950).

At trial, Judge Munson appeared to accept defendant's argument that the validity of the order under Massachusetts law formed an essential element of the federal crime that must be submitted to the jury.[4] For that reason, the judge never explicitly found before the jury verdict that the Cambridge court had jurisdiction over Casciano under Massachusetts law relating to service of process or that Casciano received due process. However, in his thorough May 1996 opinion denying defendant's post-verdict motion for acquittal or a new trial, Judge Munson clearly indicated his belief that the state court had jurisdiction under Massachusetts law to issue a valid protection order and that Casciano was not denied due process.

Chapter 209A of the Massachusetts general laws requires that the appropriate law enforcement agency serve one copy of the order, complaint and summons on the defendant. The law enforcement agency that serves the order is required to promptly make its return of service to the court. Mass.Gen.L. ch. 209A § 7. Because proceedings instituted under chapter 209A are civil in nature, Mass.Gen.L. ch. 209A § 3A; see *Frizado v. Frizado,* 420 Mass. 592, 651

N.E.2d 1206, 1210 n. 3 (1995), the district court concluded that the applicable Massachusetts rules were those of civil, not criminal, procedure. Civil practice in the Massachusetts district courts is governed by the District and Municipal Courts Rules of Civil Procedure. See Mass.Dist. & Mun. Cts.R.Civ.P. 1. Those rules provide that "[s]ervice [of process] shall be made as follows: (1) . . . by leaving copies thereof at [defendant's] last and usual place of abode; . . ." Mass.Dist. & Mun.Cts.R.Civ.P. 4(d)(1).

Although Casciano argues that he abandoned his apartment sometime prior to June 26 when the Cambridge police put notice of the protection order underneath his door, he does not seriously contend that the apartment thereby ceased to be his "last and usual place of abode" for purposes of service of process. Indeed, he concedes that he remained in control of the apartment at least through the end of June, and that his belongings remained there until June 28, when they were retrieved by his sisters. Thus, service satisfied Massachusetts Rule 4(d)(1).

However, Casciano argues that service at his last place of abode was not by itself sufficient to effect notice under Massachusetts law. The Reporters' Notes to Rule 4(d)(1) refer obliquely to Mass.Gen.L. ch. 223 § 31, which provides that:

> In an action brought in the district court, if service is made at the last and usual place of abode, the officer making service shall forthwith mail first class a copy of the summons to such last and usual place of abode.

Casciano argues, and the government concedes, that no such mailing was made. Accordingly, Casciano argues that service on him was imperfect, and the protection order that he violated was necessarily invalid.

■ As the district court noted in its opinion, however, Massachusetts cases reveal that imperfect service does not automatically invalidate a judicial order or decision when the defendant has had actual notice of the pending legal action, and no prejudice has accrued. See 927 F.Supp. at 60. Thus,

---

**4.** As discussed above, we disagree with that view.

Judge Munson cited such Massachusetts cases as *Atlas Elevator Co., Inc. v. Stasinos,* 4 Mass.App.Ct. 285, 345 N.E.2d 921 (1976); *City Council of Waltham v. Board of Appeals of Waltham,* 5 Mass.App.Ct. 773, 359 N.E.2d 651, 652 (1977) (stating that proceeding "should not have been dismissed without inquiry as to whether any of the defendants might have been prejudiced in some way" by statutorily insufficient service); and *Finkel v. Natale Rota, Inc.,* 19 Mass.App.Ct. 55, 471 N.E.2d 396, 398 (1984). In his reply brief to us, Casciano concedes that, in cases where notice does not meet the statutory notice requirement, the question whether a judgment should be vacated under Massachusetts case law depends on whether the defendant had actual notice of the action and whether defendant was prejudiced by the defective service, citing *Twomey v. Board of Appeals of Medford,* 7 Mass.App.Ct. 770, 390 N.E.2d 272 (1979).

On the record before us, there was ample evidence that Casciano had actual notice of the protection order well in advance of the hearing date. Keezer testified that she told Casciano on June 9, 1995, that she had obtained an ex parte protection order that prohibited him from seeing her, and that a hearing was scheduled at the Cambridge court on June 23. The content of the order was identical not only to the order obtained by Keezer and served on Casciano some six weeks earlier, but also to the order obtained by Casciano's previous victim. Casciano's testimony regarding the conversation on June 9 was inconsistent, and his denial of actual notice of the June 23 hearing was weak and ambiguous. On direct examination, Casciano had insisted that he "did not hear from [Keezer] at all . . . on Friday, June 9th." On cross-examination, however, the following colloquy took place:

> Prosecutor: This is June 9th, you called Susan Keezer at Mitotix and said, "I want to see you," and she told you, "The only place you are going to see me from now on is the Cambridge District Court on June 23rd."
>
> Casciano: June 9th, Friday, June 9th, 8:40 p.m., Susan Keezer called me. That is reflected in the phone bill.

> Prosecutor: She told you the only time you were going to see her was in the Cambridge District Court on June 23rd?
>
> Casciano: No, I didn't call her, nor was that the conversation.

Moreover, it was a logical inference that Casciano retrieved the notice from his "abandoned" apartment sometime between June 26, when it was left there, and June 28, when, according to his sister's testimony, the notice was not under the door when the apartment was cleaned out. In addition, the evidence at trial left the clear impression that Casciano's absence from the apartment at that time was deliberately contrived to avoid service of process. That impression was strengthened by Casciano's dismissive attitude toward those who told him, on at least two occasions after July 7, that his conduct was in violation of the protection order.

Finally, there was no showing that Casciano suffered any prejudice from the failure of the Cambridge police to mail the notice as required by ch. 223 § 31. Casciano does not suggest any argument he might have raised before the Cambridge court to convince it not to extend the protection order. More damningly, at trial Casciano himself offered into evidence the envelope of a letter that was mailed to him at his apartment, postmarked June 27, 1995. The letter was returned to sender by the post office. We realize that Casciano submitted this evidence to bolster his claim that he had abandoned the apartment by the time the Cambridge police served the protection order on June 26, and that, had the police mailed a copy of the notice as required by Massachusetts law, they would have discovered that fact. But the evidence also suggests another conclusion to us: even though notice mailed to Casciano on June 26–28 would have satisfied the requirements of ch. 223 § 31, it would not have reached him and would have provided no additional notice.

Judge Munson ended his opinion by stating he was "convinced" that his charge to the jury (which we discuss in subsection C below) was not "prejudicially erroneous under the circumstances." 927 F.Supp. at 61. It is clear from the opinion that the judge meant that service by leaving the notice at Casci-

ano's last and usual place of abode, after repeated attempts at personal service, coupled with all of the evidence of actual notice, lack of prejudice and Casciano's intention of avoiding service, was enough both to confer jurisdiction on the Cambridge court under state law and to satisfy the requirements of due process. We agree with the district court as to both conclusions.[5] Cf. *Sullivan v. Choquette*, 420 F.2d 674, 676 (1st Cir.1969) (refusing to award relief from state eviction proceeding on the basis of improper service of process, where notice of eviction was left at defendant's residence and defendant was informed of its contents over the telephone). Accordingly, Casciano's due process argument is without merit.

### C. Charge to the jury

■ Casciano also claims that we must reverse his conviction because the district court erred in charging the jury on the question of reasonable notice. At trial, the judge charged that

the Government must prove beyond a reasonable doubt ... that the defendant was given reasonable notice of the Cambridge District Court Abuse Prevention Order issued on June 9th and thereafter extended on June 23, 1995, and an opportunity to be heard on the question of continuing the order sometime between June 9, 1995, and up to and including July 7, 1995, or in any event, within a reasonable time after the order was issued.

Under Massachusetts law, reasonable notice of the Abuse Prevention Order may have been given by delivery of the order to the defendant personally *or by leaving a copy of the order at the defendant's last and usual place of abode.*

(emphasis added). Casciano contends that the underlined portion, as already indicated above, does not fully represent Massachusetts law relating to service of process. He further argues that there was at least a

reasonable possibility that the jury's verdict was materially affected by the faulty charge. Casciano also contends that the district court erred in refusing his own requested jury charge, which would have stated the requirement that notice be mailed in addition to service at his last and usual place of abode. He argues that his conviction was therefore fatally flawed by the error in the charge and must be reversed. However, in view of our holding above that if the issue of the validity of the order may be raised in the federal prosecution at all, it need not be submitted to the jury, any error in the charge regarding notice with respect to the validity of the protection order was at most harmless error.[6]

### D. Sentencing Guidelines

■ Finally, Casciano argues that the district court erred in sentencing him. First, he claims that the court should not have applied U.S.S.G. § 2A6.1 to establish his offense level. Judge Munson determined that no provision of the Sentencing Guidelines was expressly applicable to a § 2262 offense. U.S.S.G. § 2X5.1 provides that where "no guideline expressly has been promulgated, apply the most analogous offense guideline."

Based on a recommendation made in the presentence investigation report, Judge Munson determined that the most analogous guideline was U.S.S.G. § 2A6.1, Threatening Communications. That guideline carries a base offense level of 12 which, in Casciano's criminal history category, yielded a sentencing range of 30–37 months, well below the statutory maximum of five years applicable to Casciano's offense. See 18 U.S.C. § 2262(b)(5). The sentencing guideline for Threatening Communications does not contain a specific definition, but includes "a particularly wide range of conduct," U.S.S.G. § 2A6.1, comment (n. 1), and seems appropriate to Casciano's conduct.

---

**5.** We note that we are not holding that the judge was required to pass upon the validity of service on Casciano under *state* law. That the judge did so (and correctly) merely makes it unnecessary to explore further the issue whether he was required to do so.

**6.** The government also persuasively argued in its initial brief that the judge did not err in refusing to give Casciano's requested jury charge because that charge did not accurately represent Massachusetts law regarding service of process.

Casciano nonetheless asserts that the most analogous guideline for his conduct is U.S.S.G. § 2B3.3, Blackmail and Similar Forms of Extortion, which carries a lower base offense level. By its own terms, however, that section "applies only to blackmail and similar forms of extortion where there clearly is no threat of violence to person or property." Id., comment (n. 1). In view of Casciano's constant stalking and harassment of Keezer, his threats to kill any male with whom she might associate, and his use of force on at least two occasions to prevent her from leaving, § 2B3.3 clearly does not encompass the threatening nature of Casciano's conduct. Giving due deference to Judge Munson's determination, we will not disturb his application of § 2A6.1.

Casciano also argues that the district court abused its discretion by not decreasing his offense level pursuant to § 2A6.1(b)(2), since he made no credible threats of violence. The claim is frivolous. Even if we were to accept Casciano's argument that his threats of violence were not credible, the section Casciano invokes would still be inapplicable. In order to qualify for the four-level reduction, § 2A6.1(b)(2) requires that "the offense involv[e only] a single instance evidencing little or no deliberation. . . ." Casciano cannot seriously contend that his culpable conduct amounted to only "a single instance." Moreover, his success in finding Keezer's unlisted phone number and tracking her down in various places required substantial planning and deliberation.

We have considered all of defendant's arguments as to why his conviction and sentence should be overturned, and they are without merit. For the reasons set forth above, we affirm.