UNITED STATES of America, Appellee,

v.

Ralph BERNDT, Defendant–Appellant.

No. 669, Docket 97–1319.

United States Court of Appeals,
Second Circuit.

Argued Aug. 29, 1997.

Decided Oct. 7, 1997.

252

Richard P. Maigret, Assistant United States Attorney, Buffalo, NY (Patrick H. NeMoyer, United States Attorney for the Western District of New York, on the brief), for Appellee.

John Humann, Buffalo, NY (Marybeth Covert, Federal Public Defender's Office, Buffalo, NY, on the brief), for Defendant–Appellant.

Before: KEARSE and McLAUGHLIN, Circuit Judges, and TRAGER, District Judge*.

KEARSE, Circuit Judge:

Defendant Ralph Berndt appeals from a judgment entered in the United States District Court for the Western District of New York following his plea of guilty before William M. Skretny, *Judge*, convicting him of transmitting threatening communications in foreign commerce, in violation of 18 U.S.C. § 875(c) (1994), and sentencing him principal-

* Honorable David G. Trager, of the United States District Court for the Eastern District of New York, sitting by designation.

ly to 18 months' imprisonment, to be followed by a three-year term of supervised release. The sentence included an enhancement pursuant to § 2A6.1(b)(1) of the federal Sentencing Guidelines ("Guidelines") on the ground that Berndt had engaged in conduct evidencing an intent to carry out his threats. On appeal, Berndt contends principally that the enhancement was improper because the district court failed to hold a hearing to resolve disputed factual allegations, and because the evidence to support the enhancement was insufficient. He also contends that the court improperly relied on a letter from the victim of his threats that was not disclosed to him prior to sentencing. Finding no basis for reversal, we affirm.

## I. BACKGROUND

Berndt, a citizen of Germany, came to the United States seeking employment in the summer of 1995. While here, he became romantically involved with Gina Grisanti, a resident of Amherst, New York, who eventually became the victim of his threatening transatlantic calls. Most of the events are not disputed.

### A. The Threatening Calls and the Arrest of Berndt

In early 1996, shortly before a brief return to Germany, Berndt spent approximately three weeks at Grisanti's home. In March 1996, Berndt came back to the United States and moved into Grisanti's home, where the couple lived for approximately four months. By summer, the relationship had deteriorated. On June 29, the local police were called to handle a domestic dispute between the two, and Grisanti ordered Berndt to move out of her house. Law enforcement officials soon determined that Berndt's visa had expired, and they instructed him to leave the United States by July 8.

Shortly after his return to Germany in July, Berndt began placing numerous telephone calls to Grisanti at her home and office, urging her to renew their relationship and asking her to come stay with him in Germany. When she refused, Berndt began to make threatening statements. On August 8, Grisanti filed a complaint with the local police, alleging that during the preceding week, Berndt had threatened to rape and kill her. Grisanti recorded four such conversations, including statements by Berndt that he would "take [Grisanti's] daughter away from [her]" and that he would "beat [Grisanti] up" and rape her. In one such call, after Grisanti made clear that she had no intention of going to Germany, Berndt said:

> Okay. Gina next week I'll be here. Hide. Hide Gina. I get you, believe me. This is my last word. I ta[ke] all away from you, all. I'm sick of you.

During another of Berndt's tape-recorded calls, he spoke to Grisanti's former husband Michael Sweeney, telling him, "I have nothing to lose, Mike, I tell you this right now.... I buy me a ticket, I come and I kill her."

On October 4, Berndt returned to the United States. Two days later, shortly before midnight, Grisanti heard noises outside her bedroom window and called Sweeney, asking that he come to investigate. When Sweeney arrived, he found Berndt in Grisanti's fenced-in backyard and confronted him. Berndt said he had come merely to retrieve belongings he had left behind; he then left Grisanti's backyard, and Sweeney pursued him by car. Meanwhile, Grisanti called the police, who arrested Berndt a few blocks from Grisanti's home. The police report indicated that the officers found in Berndt's possession, inter alia, photographs, a ring, and three pairs of ladies' stockings. Grisanti told the police that all of the seized items had been taken from her home without her permission.

A federal information was filed, charging Berndt with transmitting in foreign commerce threats to injure another person, in violation of 18 U.S.C. § 875(c). Berndt entered into a plea agreement with the government in which he admitted that

> [o]n or about August 1, 1996, the defendant, RALPH BERNDT, willfully, knowingly and unlawfully made several telephone calls to a Ms. Gina Grisanti, at her home telephone and at her private telephone line at her place of business, both of which are in the Western District of New

York. During these telephone calls, the defendant, on several occasions during the conversation, threatened to return to the United States and to "beat up", to rape, and to kill Ms. Grisanti. At this time, the defendant also threatened to have Ms. Grisanti injured by other persons, in that he alleged that he had hired two individuals in Buffalo, N.Y. to harm her and further that he had given them the sum of $1,000.00 in return for their severely injuring her.

(Plea Agreement dated December 17, 1996, ¶ 5(a).) Berndt also admitted that these calls were made to Grisanti from Germany. (*Id.* ¶ 5(b).)

In addition, Berndt was charged in state court with two misdemeanors, to wit, criminal trespass in the second degree and criminal possession of stolen property in the fifth degree. His plea of guilty to those charges included the following colloquy:

> Q [THE COURT]. In your own words, Ralf [*sic*], tell me what you did, start with the date, I have that as being October 7 of '96, as far as stealing some socks, stockings, a ring. I didn't hear about that. I heard about photos.
>
> A [BERNDT]. Yeah, it was in my possession. I was at the house at this date.
>
> Q. What day did this happen on?
>
> A. It was from 6—from October 6th and October 7th.
>
> Q. Okay. October 6th to October 7th, so you possessed some stolen property, some stockings, a ring owned by Gina Grisanti?
>
> A. Yes.
>
> Q. And your intention was to keep them for yourself and deny her possession?
>
> A. Yes.
>
> Q. And you—did you enter unlawfully into her dwelling to obtain this property, apparently?
>
> A. Yeah. I was on the property. That's right.
>
> Q. You did enter into her property?
>
> A. Yeah.
>
> Q. No permission?

A. No.

*People v. Berndt,* Ind. No. 96–2414–000 (N.Y.Sup.Ct. Jan. 13, 1997).

## B. *The Federal Sentencing Proceedings*

The presentence report ("PSR") prepared on Berndt noted that the base offense level for transmitting threatening communications is 12, and it recommended a six-step increase on the ground that Berndt had engaged in "conduct evidencing an intent to carry out [his] threat[s]," Guidelines § 2A6.1(b)(1). In describing Berndt's offense, the PSR stated principally that in the summer of 1996, Berndt had made numerous calls to Grisanti; that those calls included repeated threats to "beat up, rape, and kill" Grisanti; and that Berndt told Grisanti he had hired people to injure her. (PSR ¶¶ 5–6.) In support of the recommended enhancement, the PSR added that after escalating the frequency of his threats, Berndt had traveled from Germany to New York; that at approximately 1 a.m. on October 7, 1996, he was arrested on charges of criminal trespass and burglary after prowling around Grisanti's residence; and that at the time of his arrest, he had personal items belonging to Grisanti in his car. (PSR ¶ 20.) The PSR noted Berndt's position that he had not come to harm Grisanti but only to retrieve his belongings from her.

The government informed the court that it agreed with the PSR's recommendations. Berndt submitted objections entitled Statement of Defendant with Respect to Sentencing Factors dated March 4, 1997 ("Berndt First Statement"). While he did not deny any fact stated in ¶ 20 of the PSR except the assertion that when arrested he had property belonging to Grisanti in his possession, he argued that there were no facts alleged in the PSR to support an inference that he was "doing something to carry out his threats." (¶ 6.) He also stated as follows:

> Paragraph 12 [of the PSR] states that the defendant broke into Ms. Grisanti's residence. The defendant denies this allegation. She says he took items that belonged to her. The defendant denies this allegation, as well. Even if the allegations were true, such action does not evidence

an intent to harm Ms. Grisanti. Such activity is consistent with Mr. Berndt's desire to get back his personal belongings. (*Id.* ¶ 8.) Berndt stated that, "[s]imply put," he had "never engaged in conduct evidencing an intent to carry out any threat against Gina Grisanti," and he therefore "t[ook] issue with Paragraph 20, which recommend[ed] a six level increase in the Offense Level." (*Id.* ¶ 1.) He urged the district court not to reject his proffered explanation without a hearing.

The government filed a memorandum in response to Berndt's objections, setting out a detailed description of the conduct in which Berndt allegedly had engaged, including the following:

On Sunday evening, October 6, 1996, the victim was at her residence with her nine-year old daughter. Shortly before midnight the victim, who was in her bed, heard noises at her bedroom window, as if someone was attempting to remove the screen. As the victim was extremely nervous as a result of the defendant's previous threatening phone calls to her, she called her ex-husband, Michael Sweeney, and requested that he come over to her house. A short time later she heard her ex-husband yell to someone in the backyard, immediately outside her bedroom window, words to the effect of "Hey! What are you doing over there?". The victim ran outside and saw her ex-husband and Ralph Berndt, in her backyard. . . .

When Mr. Sweeney had entered the backyard of the victim's at approximately midnight on October 6, 1996, he observed Ralph Berndt standing by the victim's bedroom window attempting to remove the screen and enter the house. Upon seeing Mr. Sweeney and the victim, the defendant fled from the scene. Mr. Sweeney went to his car and attempted to follow the defendant. The victim called the Amherst Police.

Mr. Sweeney caught the victim near the corner of Lennox Avenue and Eggert Road in the Town of Amherst, approximately two blocks from the victim's residence. Mr. Berndt had parked his red rental vehicle at that location.

(Government's Response to Statement with Respect to Sentencing Factors dated March 24, 1997 ("Government's First Response"), at 5–6.) The government attached numerous documents supporting its factual assertions, including the record of Grisanti's complaint to the Amherst police department about Berndt's calls in the summer of 1996, police reports of the descriptions by Grisanti and Sweeney of hearing and finding Berndt in Grisanti's yard on the night of October 6, and the transcript of Berndt's plea allocution in state court. Berndt submitted no reply to the Government's First Response.

The district court requested supplementation of the record in order to provide detail on the threats Berndt had made. The government thereafter filed a supplemental memorandum, describing Berndt's threats to return to the United States from Germany and harm Grisanti and attaching, *inter alia,* transcripts of the four calls that had been recorded. (Government's Additional Statement with Respect to Sentencing Factors dated April 29, 1997 ("Government's Additional Response").) The government argued that the PSR-recommended enhancement was appropriate, stating as follows:

It is uncontested that the defendant in late September or early October of 1996, flew from Germany to Toronto, Canada. The defendant then rented an automobile at the Toronto Airport and on October 4, 1996, crossed into the United States . . . .

It is admitted by the defendant that sometime on October 5th or 6th, 1996, the defendant entered the victim's apartment without her permission and that he stole various personal items of her property from her residence.

Of equal if not greater significance is the fact that around midnight, October 6, 1996, the defendant was discovered by Mr. Sweeney, in the victim's back yard, immediately outside the bedroom window of the victim, attempting to remove the screen and enter the victim's apartment. When Mr. Sweeney yelled at the defendant, he ran from the scene and was chased by Mr. Sweeney. The defendant was apprehended approximately two blocks from the victim's residence, by Mr. Sweeney and

Amherst Police Officers, who had been called by the victim.

(*Id.* at 5–6.)

Berndt submitted a reply to the Government's Additional Response in the form of an affidavit from his attorney. (Counsel's Affidavit in Reply to Government's Submission [of] April 29, 1997, dated May 6, 1997 ("Berndt Second Statement").) This submission reiterated Berndt's argument that he had been "hanging around [Grisanti's] house" (*id.* ¶ 6) merely because he wanted to retrieve his property, and stated, in pertinent part, as follows:

4. Under U.S.S.G. § 2A6.1(b)(1), the conduct which the government must prove to increase the base offense level, must be specific conduct aimed at carrying out these specific threats; that is the threat to physically harm the victim.

5. The government offers no such proof on pages 5–7 of is [*sic* ] submission to the court. All the government offers are conclusions and opinions, but not hard proof as to the defendant's intent in coming back to the United States. *The defendant does not admit that he entered the victim's apartment without permission, nor does he admit that he stole personal items from the victim. Although he did take a plea in county court to that effect, he only entered the plea so that he could be released to federal custody and have the time that he spends in jail count toward the federal sentence.* Otherwise, all the time that he has been waiting to be sentenced federally, would not count toward his eventual sentence.

6. The fact that Mr. Berndt was found hanging around the house does not prove that he took any action to harm the victim.

(Berndt Second Statement ¶¶ 4–6 (emphasis added).)

At the sentencing hearing held on May 27, 1997, the district court declined to hold an evidentiary hearing, indicating that it had adopted paragraphs 3–6 of the PSR, as to which there was no real dispute (Sentencing Transcript, May 27, 1997 ("S.Tr."), at 6), and that the dispute as to whether or not there should be a six-level enhancement for conduct evidencing an intent to carry out the threats could be resolved on the basis of the prior written submissions:

I don't believe that a hearing is necessary in this instance. . . . A hearing is one way to present the factual material necessary to a resolution of the objections, but other effective methods include affidavits, letters, other written submissions, oral argument or comment without the presentation of testimonial evidence. . . . Now, as both sides know, I've asked you to submit additional proof. I've asked the government to come forward with the corroborating evidence, bottom line, that Mr. Berndt, for purpose of this enhancement, had the intent to carry out the threats he made.

The government did so, and it has proven by a preponderance of the evidence that Mr. Berndt's conduct evidenced an intent to carry out the threats he made to Miss Grisanti. Mr. Humann has argued at paragraph six [of the Berndt First Statement] that there are no facts in the presentence report which support the inference that Mr. Berndt was, quote, doing something to carry out his threats against Gina, close quote. To the contrary in my view, however, there is a strong connection between the threats that you made, Mr. Berndt, and the conduct which led to your apprehension here in Western New York.

. . . . [I]n assessing whether a defendant intended to carry out a threat, courts have looked not only to the overt activity surrounding the threat, but even to the nature of the threats themselves. . . . *Mr. Berndt, as I see it, your threats to Miss Grisanti included statements that, among others, for example, you were coming to get her, that you would, quote, be there next week, close quote, that you would, quote, buy a ticket, come and kill her, close quote. And that you would, quote, lock her inside the house, close quote, and rape her, among other things. Shortly after making these threats you bought yourself a ticket and came all the way from Germany to Miss Grisanti's window.*

Now, I looked at Miss Grisanti's letter to me of February 20th, and it details the trauma she and her daughter have suf-

fered and continue to endure as a result of those events.

Given the words, Mr. Berndt, that you yourself chose in your phone calls, your intent to carry out your threats could only have been more obvious if time and unfortunate circumstances had given you the opportunity to press your scheme further. . . .

I've reached that conclusion most particularly after listening to the tapes themselves. I played them. I contemplated them. I listened to them. . . . Mr. Berndt, your words on the tapes, when coupled with your subsequent actions, provide more than enough compelling reason to conclude that this was more than, at the time, your being a frustrated ex-boyfriend making idle threats. I don't believe that, and those words and those comments and the scenario does not establish that.

I'm therefore persuaded by a preponderance of the evidence that your conduct evidenced your intent to carry out the threats that you used and made through the language that appears on the tapes.

(S.Tr. 8–12 (emphasis added).)

The February 20 Grisanti letter referred to by the court detailed the chilling effects that Berndt's threats and his attempted break-in had had on Grisanti and on her daughter. The letter had been sent to the district court, the United States Attorney's office, and the probation office; but no copy had been given to Berndt or his attorney prior to the sentencing hearing. At that hearing, defense counsel requested a copy, and after the hearing he was given one.

After hearing argument from counsel as to the significance of Berndt's conduct at Grisanti's residence on October 6–7, and allowing Berndt to speak on his own behalf, the court adhered to its ruling that his acts constituted conduct evidencing an intent to carry out his threats. Berndt was sentenced as indicated above, and this appeal, which was permitted under the terms of the plea agreement, followed.

## II. DISCUSSION

The Guidelines provide that a defendant convicted of making a threatening communication is to have his offense level enhanced by six steps if "the offense involved any conduct evidencing an intent to carry out such threat." Guidelines § 2A6.1(b)(1). On appeal, Berndt contends principally (a) that he was entitled to an evidentiary hearing as to his purpose in returning to Grisanti's residence, and (b) that without the resolution of disputed facts in the government's favor, there was insufficient evidence to justify the § 2A6.1(b)(1) enhancement. He also contends that he was denied due process because he was not given the Grisanti letter prior to sentencing. For the reasons that follow, we find no basis for reversal.

### A. *The Need for a Hearing*

■ A defendant has a due process right to notice of, and an opportunity to challenge the accuracy of, information on which the district court intends to rely in imposing sentence. *See, e.g., Townsend v. Burke,* 334 U.S. 736, 741, 68 S.Ct. 1252, 1255, 92 L.Ed. 1690 (1948); *United States v. Rodriguez–Gonzalez,* 899 F.2d 177, 182 (2d Cir.), *cert. denied,* 498 U.S. 844, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990); *United States v. Romano,* 825 F.2d 725, 730 (2d Cir.1987); *United States v. Fatico,* 579 F.2d 707, 711–14 (2d Cir.1978). Thus, the Guidelines make clear that "[w]hen any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor." Guidelines § 6A1.3(a).

■ The procedures to be adopted for resolution of such disputes lie within the sound discretion of the sentencing judge. *See, e.g., United States v. Olvera,* 954 F.2d 788, 792 (2d Cir.), *cert. denied,* 505 U.S. 1211, 112 S.Ct. 3011, 120 L.Ed.2d 885 (1992); *United States v. Prescott,* 920 F.2d 139, 144 (2d Cir.1990); *United States v. Pugliese,* 805 F.2d 1117, 1123 (2d Cir.1986). "Written statements of counsel or affidavits of witnesses may be adequate under many circumstances," whereas in others "[a]n evidentiary hearing may . . . be the only reliable way to

resolve disputed issues." Guidelines § 6A1.3 Commentary; *see, e.g., United States v. Brinkworth,* 68 F.3d 633, 640 (2d Cir.1995); *United States v. Ibanez,* 924 F.2d 427, 430 (2d Cir.1991); *United States v. Prescott,* 920 F.2d at 144; *United States v. Garcia,* 900 F.2d 571, 574 (2d Cir.1990); *United States v. Fatico,* 603 F.2d 1053, 1057 n. 9 (2d Cir.1979). In general, if there is a dispute as to a fact that the sentencing court will not rely on, no resolution of that dispute is necessary. *See generally United States v. Romano,* 825 F.2d at 730 ("When a district judge determines that the disputed matter will not be taken into account at sentencing, no factual findings concerning the alleged inaccuracies [in the PSR] are required.").

■ In the present case, Berndt contends he was denied due process because the district court refused his request for an evidentiary hearing with respect to his denials of the government's factual assertions. We disagree for several reasons.

■ First, to the extent that Berndt denied to the district court (a) that he had ever entered Grisanti's home without permission, and (b) that the items found in his possession belonged to her, the court properly rejected those denials without a hearing. Both facts were elements of the state-law crimes of which Berndt was convicted and were expressly admitted by Berndt in his state-court plea allocution, quoted in Part I.A. above. A guilty plea is an unconditional admission of guilt, *see, e.g., United States v. Maher,* 108 F.3d 1513, 1528 (2d Cir.1997), and constitutes "an admission of all the elements of a formal criminal charge," *McCarthy v. United States,* 394 U.S. 459, 466, 89 S.Ct. 1166, 1171, 22 L.Ed.2d 418 (1969). As to those elements the plea is "as conclusive as a jury verdict." *LaMagna v. United States,* 646 F.2d 775, 778 (2d Cir.), *cert. denied,* 454 U.S. 898, 102 S.Ct. 399, 70 L.Ed.2d 214 (1981). Berndt was precluded from denying the facts he admitted in his state-court plea allocution.

Second, to the extent that Berndt denied observable facts that he was not estopped to deny by reason of his state-court plea allocution, those facts were entirely inconsequential. For example, he disputed the government's assertion that when confronted by Sweeney in Grisanti's backyard at midnight on October 6, he "fled." Rather, Berndt says he "walked" away. He also disputed the assertions that he had driven around the neighborhood before approaching Grisanti's house, that he parked his car two blocks away before entering her backyard, and that he was "at th[e] screen at the back[ ]door." (S.Tr.19–20, 24–25.) But these disputes as to details were trivial in light of the conduct Berndt had admitted (a) in his plea allocution in state court, *i.e.,* that he had entered Grisanti's property without permission, and (b) in his argument to the district court, *i.e.,* that Berndt was found "in the backyard at" Grisanti's house on October 6 at midnight (S.Tr. at 15 (statement of defense counsel)).

We note that if the district court had wished to rely on such disputed details as Berndt's alleged running away from Sweeney and parking his car a suspicious distance from Grisanti's house, it should have held an evidentiary hearing to resolve those factual disputes. And to the extent that the court chooses not to rely on facts that are in dispute, it is helpful for the court to state on the record that it does not rely on those facts. When the record is sufficiently clear, however, as to the facts on which the court did place reliance, we will not impute to the court reliance on other facts as to which reliance would have been, in the circumstances, improper. In the present case, the district court stated that it could resolve the enhancement question without a hearing because it based its conclusion on the facts that Berndt had made "threats to Miss Grisanti includ[ing] statements that, among others, for example, you were coming to get her, that you would, quote, be there next week, close quote, that you would, quote, buy a ticket, come and kill her, close quote. And that you would, quote, lock her inside the house, close quote, and rape her, among other things," and that "[s]hortly after making these threats you bought yourself a ticket and came all the way from Germany to Miss Grisanti's window." (S.Tr.10.) We see no indication in the record that the district court relied on the disputed assertions or, indeed, on any other facts that were not, or had not conclusively been, admitted.

Finally, the principal thrust of Berndt's request for a hearing was his dispute as to the intent with which he acted. As indicated above, the conduct on which the court relied—the threat to come from Germany to harm Grisanti, followed by Berndt's coming from Germany and entering her backyard in the middle of the night—was not disputed. To the extent that Berndt wanted to persuade the court that his midnight visit to Grisanti's backyard was an innocent attempt to retrieve property he had left in her house, and did not bespeak any effort to carry out his threats, no evidentiary hearing was required. Berndt's argument that the government had offered "no[ ] hard proof as to [his] intent" (Berndt Second Statement ¶ 5) is wide of the mark. Such "hard proof" as to a mental state is rare. Further, the applicability of the enhancement does not depend on the defendant's actual intent, which could exist regardless of whether any actions were taken toward carrying it out; rather it depends on whether or not the defendant engaged in conduct from which the court permissibly infers such an intent. The question as to whether such an intent was inferable from the undisputed or conclusively established conduct here lent itself to resolution after written submissions and oral argument.

There was no dearth of either. Berndt's position that he had gone to Grisanti's home solely to retrieve his property was set out in the PSR. It was argued repeatedly by defense counsel in written submissions and in oral argument at sentencing. In addition, Berndt was given an opportunity to speak at the sentencing hearing, and he again reiterated his position. We conclude, in light of the basis stated by the district court for the enhancement, that the ruling that an evidentiary hearing was not necessary was neither a denial of due process nor an abuse of discretion.

B. *The Sufficiency of the Evidence To Support the Enhancement*

We also reject Berndt's contention that the evidence, exclusive of the validly disputed facts, was insufficient to support the § 2A6.1(b)(1) enhancement for "conduct evidencing an intent to carry out [the] threat[s]." In reviewing a sentence, the appellate court "shall give due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e) (1994); *see, e.g., United States v. Sovie,* 122 F.3d 122, 128–29 (2d Cir.1997); *United States v. Kirsh,* 54 F.3d 1062, 1072 (2d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 330, 133 L.Ed.2d 230 (1995). We will not overturn the court's application of the Guidelines to the facts before it unless we conclude that there has been an abuse of discretion. *See, e.g., United States v. Casciano,* 124 F.3d 106, 115 (2d Cir.1997).

In *United States v. Kirsh,* we ruled that the defendants' purchase of guns and attempted purchase of ammunition during the time they were sending threatening letters was conduct sufficiently evidencing an intent to carry out their threats to warrant the imposition of a § 2A6.1(b)(1) enhancement. 54 F.3d at 1073. By contrast, in *United States v. Sovie,* we ruled that the conduct at issue was insufficient for such an enhancement. There, the authorities had a warrant for the defendant's arrest on account of his threats, but they could not find him. They therefore arranged for the threat victim to call the defendant and ask him to meet her. He did so at a bus station some 60 miles from the victim's residence. Noting that although the defendant had the victim's address he had not gone to her home; and that although he had her telephone number he had not called her to initiate the eventual meeting, we ruled that where the only evidence of pertinent post-threat conduct was the defendant's traveling to meet the threat victim at her request, the § 2A6.1(b)(1) enhancement was impermissible.

The present case lies somewhere between *Kirsh* and *Sovie.* Although no weapons were found in Berndt's possession, he did, as he had threatened, make a nearly 4,000 mile trip from Germany to Grisanti's home; he had no permission to enter her property; and he was found lurking in her backyard at midnight. We see no abuse of the district court's discretion in its application of § 2A6.1(b)(1) to these circumstances. The evidence was sufficient to support the en-

hancement for conduct evidencing an intent to carry out the threats.

### C. *The Belated Disclosure of the Grisanti Letter*

■ Lastly, Berndt contends that he was denied due process because the district court considered Grisanti's letter, which was not disclosed to him until after he was sentenced, thus denying him a timely opportunity to respond. We agree that it was error for this letter not to have been timely disclosed, *see, e.g.,* Fed.R.Crim.P. 32(c)(1) (defendant must be given "an opportunity to comment on . . . matters relating to the appropriate sentence"), and authorities cited in Part II.A. above, but for several reasons we conclude that the error was harmless.

First, the bulk of Grisanti's letter dealt principally with how Berndt's actions had affected Grisanti and her daughter, a summary of which appeared in the PSR's *"Victim Impact Statement"* section. Berndt had ample opportunity to respond to the PSR.

Second, the § 2A6.1(b)(1) enhancement depends on a defendant's conduct as it may evidence his intent to carry out his threats, and Grisanti's letter contained only two assertions as to Berndt's October 1996 conduct, to wit, (1) that Berndt broke into her home through a bathroom window on October 5, 1996, and (2) that Berndt tried to break in through her bedroom window shortly before his arrest in the wee hours of October 7. The essence of both of these assertions had been included in other documents that were given to Berndt. As to the first assertion, the PSR stated that Berndt had broken into Grisanti's home approximately two days before his October 7 arrest; and the Government's Additional Response asserted that sometime on October 5 or 6, Berndt had entered Grisanti's apartment without her permission. Berndt had an opportunity to respond to these descriptions, and indeed he did respond. The substance of the second assertion was spelled out in detail in the Government's First Response to the Berndt First Statement, as indicated in Part I.B. above, and was summarized in the Government's Additional Response. Berndt had an opportunity to respond to these descriptions,

though he did not do so. Thus, while Berndt was not given an opportunity to examine the letter itself before sentencing, all of the factual allegations pertinent to the § 2A6.1(b)(1) enhancement had been disclosed to him far in advance of the sentencing hearing.

Finally, although the district court mentioned the Grisanti letter at that hearing, it did so in a way that indicated that the contents of that letter were not relied on for the § 2A6.1(b)(1) enhancement. The court's only reference to the letter, made after the court had noted that Berndt had threatened to come back from Germany to harm Grisanti and then had in fact traveled from Germany to Grisanti's window, was as follows: "Now, I looked at Miss Grisanti's letter to me of February 20th, and it details the trauma she and her daughter have suffered and continue to endure as a result of those events." We see no indication that the judge placed any reliance on Grisanti's letter for his findings as to Berndt's actions. We conclude that the error was harmless beyond a reasonable doubt.

### CONCLUSION

We have considered all of Berndt's contentions on this appeal and have found in them no basis for reversal. The judgment of conviction is affirmed.